Clifford J. GROH et al., Appellants,

v.

William A. EGAN, Governor of Alaska,
et al., Appellees.

No. 2233.

Supreme Court of Alaska.

Sept. 13, 1974.

----◆----

Kenneth P. Eggers, Clifford J. Groh, Groh, Benkert & Walter, Anchorage, for appellants.

James N. Reeves, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellees.

Ben T. Delahay, Borough Atty., Soldotna, as amicus curiae for Kenai Peninsula Borough.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

## OPINION

BOOCHEVER, Justice.

For the third time, we are confronted with a challenge to the reapportionment of the Alaska legislature.[1] In Egan v. Hammond, we held that the 1971 reapportionment of the Alaska legislature, which was promulgated pursuant to the mandate of Art. VI of the Alaska Constitution, was unconstitutional under the equal protection and supremacy clauses of the United States Constitution. Due to the imminence of the 1972 elections we adopted an interim plan of reapportionment for the 1972 legislative elections. The case was thereafter remanded to the superior court which on January 13, 1973 issued an order, pursuant to our mandate, requesting the governor of the State of Alaska, with the assistance of an advisory board appointed by him, to develop a permanent reapportionment plan for the Alaska legislature. The governor appointed an advisory board which, after conducting numerous public hearings, submitted a report and proposed plan of reapportionment[2] which was adopted by the governor on December 11, 1973.

Suit was commenced in the superior court challenging the validity of the plan. After trial of the case, Judge Singleton entered a judgment on May 14, 1974 dismissing the action on the merits. Appellants raise the following issues on appeal:

1. Population variance between districts was excessive.

2. The division of the Greater Anchorage area into six districts violated the Alaska constitutional requirement that districts be formed of contiguous and compact territories containing as nearly as practicable a relatively integrated socio-economic area.

3. There was no need to truncate the terms of four senators, and termination of their terms constituted a denial of equal protection.

4. The use of a formula establishing the number of military personnel to be included in the population base violates the due process and equal protection clauses of the United States and Alaska constitutions.

5. Failure to base the plan on the latest population data resulted in malapportionment.

Because of the imminence of the 1974 elections, we expedited briefing and heard arguments on June 4, 1974. On June 6, we entered an order approving all aspects of the plan except the composition of specified house and senate districts, which we found exceeded permissible constitutional

---

1. *See* Egan v. Hammond, 502 P.2d 856 (Alaska 1972) and Wade v. Nolan, 414 P.2d 689 (Alaska 1966).

2. The report was unanimously approved by the five-member board, with the exception of the districting of the Anchorage area, to which portion of the report two members dissented.

limits regarding population variances without adequate justification.[3]

The case was remanded to enable the governor of the State of Alaska, if he desired, to resubmit the plan to the Advisory Reapportionment Board for the purpose of revising it and bringing the districts specified within constitutional standards.[4] We stated in our order that a full opinion would follow.

## I

## STANDARD OF REVIEW

Besides determining whether the reapportionment plan meets constitutional requirements, we must settle upon an appropriate standard of review applicable in Alaska reapportionment cases. Article VI of the Alaska Constitution provides for reapportionment of the House of Representatives by the governor after each decennial census. Although no comparable provision governs reapportionment of the senate, we have held that the Senate, too, must be similarly reapportioned in order to conform to constitutional requirements imposed by the United States Supreme Court.[5] Section 11 of Article VI confers original jurisdiction on the superior court to hear challenges to the reapportionment plan, and provides that "On appeal, the cause shall be reviewed by the supreme court upon the law and the facts."

■■ Appellants argue that this constitutional authority confers upon the supreme court the power to decide what is preferable between alternative rational plans. We do not so construe our authority, for if that were the case, there would be little reason to provide for the governor to promulgate the reapportionment plan after receiving the recommendations of the Advisory Reapportionment Board.[6] The constitutional authority to reapportion resides in the executive, not the courts. Jurisdiction is conferred on the courts only when an application is made to compel the governor, "[T]o perform his reapportionment duties or to correct any error in redistricting or reapportionment."[7] It cannot be said that what we may deem to be an unwise choice of any particular provision of a reapportionment plan from among several reasonable and constitutional alternatives constitutes "error" which would invoke the jurisdiction of the courts.

■■ We view a plan promulgated under the constitutional authorization of the governor to reapportion the legislature in the same light as we would a regulation adopted under a delegation of authority from the legislature to an administrative agency to formulate policy and promulgate regulations. We have stated that we shall review such regulations first to insure that the agency has not exceeded the power delegated to it, and second to determine whether the regulation is reasonable and not arbitrary. Of course, additionally, we always have authority to review the constitutionality of the action taken, but we have stated that a court may not substitute its judgment as to the sagacity of a regulation

---

3. A copy of the order of remand is appended hereto as Exhibit A.

4. The governor did resubmit the plan to the Board, which recommended changes in the various districts, and the governor has submitted the revised plan to this court.

5. *See* Egan v. Hammond, 502 P.2d 856, 874 (Alaska 1972); Wade v. Nolan, 414 P.2d 689, 700 (Alaska 1966).

6. Art. VI, §§ 3 and 8, Alaska Constitution.

7. Art. VI, § 11 of the Alaska Constitution provides:

Any qualified voter may apply to the superior court to compel the governor, by mandamus or otherwise, to perform his reapportionment duties or to correct any error in redistricting or reapportionment. Application to compel the governor to perform his reapportionment duties must be filed within thirty days of the expiration of either of the two ninety-day periods specified in this article. Application to compel correction of any error in redistricting or reapportionment must be filed within thirty days following the proclamation. Original jurisdiction in these matters is hereby vested in the superior court. On appeal, the cause shall be reviewed by the supreme court upon the law and the facts.

for that of the administrative agency, and that the wisdom of a given regulation is not a subject for review.[8] The superior court indicated that it applied these criteria to its review of the reapportionment plan, and we shall apply like standards in our review of the law and facts raised by this appeal.

█ One other aspect of our review function pertains to the weight to be given to the decision of the superior court. When the reapportionment article was first proposed at the constitutional convention, original jurisdiction for review was vested in the supreme court. After discussion, it was deemed more practical to have original jurisdiction in the superior court, but the delegates indicated a preference for the application by the supreme court of a standard other than the familiar "abuse of discretion" test in reviewing the decision of the superior court. The draft was amended to specify that "[o]n appeal, the cause shall be reviewed by the supreme court upon the law and the facts."[9] The minutes of the Constitutional Convention indicate that the drafters of this provision

intended that appellate review be in the nature of a de novo proceeding, but without additional evidence being presented.[10] Accordingly, in reviewing the reapportionment plan we shall consider the matter de novo upon the record developed in the superior court.

II

## USE OF THE 1970 CENSUS DATA

In determining the population base to be used for reapportionment, the Advisory Board relied upon the 1970 decennial census. Appellants contend that there were more accurate and current data available, and that it was improper not to utilize them.

Article VI, Section 3 of the Alaska Constitution provides that, "[R]eapportionment shall be based upon civilian population within each election district as reported by the census." In Egan v. Hammond, we held that the elimination of military personnel as a class was unconstitutional, and that the "civilian population" clause could not be severed from the requirement that

8. *See* Kingery v. Chapple, 504 P.2d 831, 834–835 (Alaska 1972) ; Kelly v. Zamarello, 486 P.2d 906, 911 (Alaska 1971).

9. Alaska Constitution art. VI, § 11.

10. The intent was best articulated by Delegate McLaughlin:

> I believe, Mr. Johnson, in answer to you, there was one addition that Mr. Taylor desired. He desired not only a review on the law, but he wanted to make sure that the supreme court could review all the facts as presented in the superior court. He wanted in substance a trial de novo without any other evidence than the evidence presented in the superior court. That's why he insisted that the law and facts appear there.

Minutes, Constitution Convention 1947. Previously, the following exchange had taken place between Delegates Taylor and Hellenthal:

> Taylor: . . . Why in this proposed article, did you confer upon the supreme court of the State of Alaska original jurisdiction to try disputes as to reapportioning?
>
> Hellenthal: That language came identically from the language of the Hawaii Consti-

tution which was recently adopted, and we felt that the matter of such supreme importance as this should be conferred on the supreme court and that they should be given original jurisdiction. There might be a better court.

> Taylor: Do you not believe that the superior court could be more available to any disgruntled voter . . . and allow the supreme court of Alaska to be the appellate court . . . ?
>
> Hellenthal: Of course their review would be confined to review of legal matters and not facts. Perhaps it was thought that the supreme court was a bit more detached than a superior court.
>
> Taylor: But if the district courts abuse their discretion, you can always raise that in the appellate court.
>
> Hellenthal: But as you know and I know as lawyers, to raise the question of abusive [sic] discretion you have got to be awfully right.
>
> Taylor: Could you not in your proposal put it that the superior court should have original jurisdiction and that the supreme court would be the appellate court and also could find as to the facts? (Minutes, pp. 1859–60).

reapportionment be based exclusively upon census data. We concluded that alternatives to the census base could be utilized.[11] Thus, there is no longer a specific constitutional mandate as to the population base to be utilized by the governor. On the other hand, it has never been held that the due process or equal protection clauses of the United States or Alaska constitutions dictate reapportionment upon some population base other than that of decennial census.[12] In fact, in Reynolds v. Sims, the United States Supreme Court stated:

> In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation.[13]

While *Reynolds* indicates that it is not necessary to reapportion more frequently than decennially, it does not really address itself to the question of what population data may be used. There can be little question but that the general principle of equalizing votes per persons can best be achieved by use of the most current accurate data reasonably available. We indicated in Egan v. Hammond, that in the absence of a constitutional amendment reestablishing specific guidelines, the governor has the power to select alternative bases for reapportionment purposes. We referred to the permissibility of a registered voter, state citizenship or state residency base.[14] Similarly, the governor may select from among different available statistical compilations.

Since the governor's authority to choose census data as a population base is not limited by either the state or the federal constitution, our review is restricted to whether that authority has been exercised in a rational as opposed to an arbitrary manner. The report of the Reapportionment Advisory Board evidences thorough and exemplary exploration of the possibility of using more current statistics. Only after alternatives were carefully examined was the determination made to use the 1970 census data. As to the rationality of that decision, we agree with the findings of the superior court:

> The Advisory Reapportionment Board examined the feasibility of such an update. Its statistical technician (who is otherwise the employee of the Research and Analysis Section who is responsible for preparing that office's annual estimates) and its counsel sought the advice of Dr. George Rogers on this matter and were informed that it would be impossible to update the 1970 data in a statistically meaningful way with the geographical specificity required for reapportionment. The Board also took this question up with Ronald Evans, federal census coordinator at the University of Alaska's Institute for Social, Economic and Government Research, who advised that updated population data was not available and that it would be possible to contract with the Census Bureau to obtain a special census for reapportionment purposes at a cost of about $250,000. For these reasons, and in addition because the Annual Estimates represent population in July rather than in April and cannot effectively be extrapolated with geographic

11. 502 P.2d at 870–871.

12. Justice Brennan in his dissent in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, 334 (1972), asserted that a reapportionment plan must be "grounded on the most accurate available data", and that unreliability of data may necessitate invalidation of a plan. No holding of the United States Supreme Court, however, implies that decennial census data is not constitutionally appropriate, and Justice Brennan did not address himself to the question of how current reapportionment data must be.

13. 377 U.S. 533, 583, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506, 540 (1964).

14. 502 P.2d at 870.

specificity, it was not unreasonable for the Board to conclude that it could not effectively update 1970 census data.

The use of the 1970 census data under those circumstances did not constitute error.

## III

## MILITARY PERSONNEL

The Advisory Board sought to eliminate from the data base, to the extent that reliable information could be developed on which to do so, all nonresidents who could be statistically identified. The Board found that approximately 26 percent of the census population consisted of military personnel and their dependents, substantial numbers of whom were not residents of the state.[15] A complicated formula was established whereby 28,581 of the approximately 78,-998 military and military dependents,[16] were eliminated from the population base. Appellants contend that the elimination of a portion of the military personnel from the population base constitutes an unconstitutional employment classification violative of due process and equal protection.[17]

In Egan v. Hammond, we wrestled with the thorny problem of accounting for military personnel in the Alaska population base. Since many of the considerations there discussed are still controlling on this issue, we shall summarize the basic rationale of that case.[18] We held invalid the constitutional requirement that reapportionment shall be based upon civilian population within each election district as reported by the census for the reason that military personnel as a class could not be eliminated arbitrarily. We pointed out, however, that by holding such elimination unconstitutional we were not saying "that some military cannot be excluded as a permissible device for limiting the impact of transients and nonresidents on legislative districting." Reference was made to the possibility of using a registered voter base, which has been approved in Burns v. Richardson,[19] or employing a state citizen or state residency basis. We expressed what has now proved to be a vain hope that the legislature would update the reapportionment provision of the Alaska Constitution with an appropriate constitutional amendment.

15. The masters we appointed collected the following data regarding participation of military personnel in the 1970 general election: Elmendorf and Fort Richardson, 102 voters of 9,445 population over age 18; Eielson and Fort Wainwright, 172 voters of 10,276 population over age 18; Shemya Station, no voters among 1,085 population over age 18; Kodiak Station, 78 voters of 1,717 population over age 18. In these six enumeration districts populated by military personnel and their dependents, there were thus only 352 voters from an adult population of 22,523 or less than 1.6 percent. Approximately 52 percent of non-military adults voted in the same election. Egan v. Hammond, 502 P.2d at 909, see 502 P.2d at 862 (Boochever, J., dissenting). If voting can be taken, as we believe, to be an indication of a person's desire to make a state his home, the desires of Alaska-based military personnel have been clearly expressed in the negative. Of all the military personnel in Alaska, only 190 claimed to be residents of record according to the Alaska Command at the time of Egan v. Hammond, id. at 862, and nothing in the record indicates that this figure has changed significantly.

16. In April 1970, the census indicated that there were 32,113 uniformed military personnel in the state. Figures provided by the Alaska Command and other sources indicated approximately 1.46 military dependents for each uniformed military personnel in July 1973. Assuming the same ratio in 1970, there were 46,885 military dependents and personnel in 1970. Thus, military personnel and their dependents accounted for 78,998 of the state's 1970 population of 302,361. Although the Board originally sought to eliminate nonresident military and nonresident dependents, the exclusionary formula was finally applied only to uniformed personnel.

17. See Davis v. Mann, 377 U.S. 678, 691, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609, 617 (1964): Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible.

18. See 502 P.2d at 868–871.

19. 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

In the absence of any constitutionally mandated population base, the Advisory Board sought information regarding Alaska's transient population. Military personnel were found to be the most prominent component, and on the basis of its data the Board found a certain proportion of the military to be excludable from the population base. The dissent finds error in the decision to exclude military transients from the apportionment population base primarily because the Board failed to treat civilian transients equally. For three reasons we find the Board's decision reasonable: (1) it was reasonable for the Board to conclude that civilian transients are not present in significant numbers in April, when the census data was obtained; (2) even if transients were present, they were not included in the Alaska census population, although all military stationed in Alaska were so included; (3) the special nature of military transience creates a reasonable basis to distinguish between military and civilian transients.

Initially we believe the Board was justified in concluding that civilian transients were not included in the 1970 Alaska census figures. The 1970 census data, upon which the exclusion was based, was obtained in April. The seasonality of tourism in Alaska is well known; although published data on tourist presence is not readily available, the absence of tourists in the state during school months and before the spring thaw is common knowledge. The likelihood that any number of tourists could have been included in Alaska's census population is, therefore, minute. The seasonality of much of Alaska's employment market has been authoritatively documented over several decades.[20] Specific data bearing out the general trend in recent years, and the 1970 census year in particular, is available through the Alaska Workforce Estimates prepared on a monthly basis by the Research and Analysis Section of the Employment Security Division of the Alaska Department of Labor. A review of those documents for 1970 shows the presence in April 1970 of a total statewide labor pool of 109,972 employable civilians.[21] That figure is but 7,000 more than the January ebb and over 17,000 less than the 127,144 peak in July.[22] The actual number of persons employed showed a similar pattern of increase and decline; for instance, in the food processing industry, which is inextricably tied to the highly seasonal fishing industry,[23] total employment doubled from 6,700 in April to 13,600 in July.[24]

Even if non-military transients were contacted by census takers in Alaska, it does not follow that they were included in Alaska's population. The census enumerates a person according to his "usual place of residence".[25] That clause is "generally

20. *See* Rogers, G. W. and Cooley, R. A., Alaska's Population and Economy, 127–30 (1962); Rogers, G. W., The Future of Alaska, 106–07 (1962); Rogers, G. W., Alaska, The Economy and the Labor Force, 78 Monthly Labor Rev. 1375 (1955); *cf.* Rogers, G. W., Alaska Regional Population and Employment, University of Alaska S.E.G. Report No. 15 at 36, 94 (1967). *See generally* Research and Analysis Section, Empl. Security Div., Alaska Dept. of Labor, Alaska Workforce Estimates by Industry and Area, 1965–72. The workforce estimates are prepared under mandate of the United States Department of Labor to the state to make available to the public, "accurate and timely area manpower and job market information for decision-making purposes." III United States Department of Labor, Employment Security Manual § 9020, *implementing* 20 C.F.R. § 602.6, *implementing*

29 U.S.C. § 301 *et seq.* We harbor no reluctance to take notice of such authoritative sources documenting a well known aspect of the Alaska economy. Civil Rule 43(a)(2)[c] and 43(a)(2)[d].

21. Research and Analysis Section, Empl. Security Div., Alaska Dept of Labor, Revised 1970 Alaska Workforce Estimate (1972).

22. *Id.*

23. *See generally* authorities cited at note 20, *supra.*

24. Research and Analysis Section, Empl. Security Div., Alaska Dept. of Labor, Revised 1970 Alaska Workforce Estimate (1972).

25. Bureau of the Census, Social and Economic Statistics Administration, United States Department of Commerce, Characteristics of the Population, Part A at v. (1971).

construed to mean the place where [a person] lives and sleeps most of the time."[26] Transient individuals in Alaska in April 1970 were not necessarily counted as Alaska residents. For example, the residence of tourists was attributed to their state of origin.[27] The same was true where a short-term worker was encountered in Alaska.[28] Those persons who were counted as residents of Alaska lived and slept here "most of the time", and it would be difficult to find a basis for excluding them from the population base.

Servicemen were treated very differently from civilians by the census, however:

> Members of the Armed Forces living on military installations were counted, as in every previous census, as residents of the area in which the installation was located. Similarly, members of the Armed Forces not living on a military installation were counted as residents of the area in which they were living. Crews of U.S. Navy vessels were counted as residents of the home port to which the particular vessel was assigned. . . .[29]

Thus the census fails to cull out the nonresident from the military census population, although it does so with respect to the civilian population.[30] In that distinction alone lies justification for the Board's excluding of nonresident military persons without also attempting to eliminate civilian nonresidents.

Finally, in concluding that the exclusion of the military cannot be reconciled with "the board's tolerance toward civilian transients" and comparing the exclusion of military personnel to a durational residency requirement, the dissent in our opinion ignores·the fundamental reason for the exclusion of some military personnel—their want of any contact with the state beyond mere presence. Although some may volunteer for such duty, military personnel are ordered to report to the Alaska Command. Recognizing the involuntary nature of military assignment, common law courts, including the territorial district court,[31] have long stated that a person who enters the military retains the residence and domicil he established before entering the

26. *Id.*

27. *Id.* at vi.

28. *Id.* The rules followed by census enumerators to decide residence questions further support the understanding that civilian transients were not included in Alaska's census population in a significant number. Persons who maintained a permanent residence elsewhere than Alaska but were encountered in Alaska because of seasonal employment would have been classified as "Person who has more than one home and divides time between them", and the assigned residence would have been "Place where he spends largest part of calendar year." Bureau of the Census, United States Department of Commerce, Enumerator's Handbook Pub. D–507 [Rule 11] at 76. (The rules may also be found in other versions of the handbook, Publications D–500, D–520 and D–526.) Thus, the census included as Alaska residents only those transients who spent a majority of the year in Alaska. For the Board to seek to determine who among them actually considered themselves to be state citizens would be a Herculean task, if it could be accomplished at all. Persons who were in Alaska as seasonal laborers when their families were enumerated in other states would also have been referred back as residents of the locale of the family household. *Id.* [Rule 1] at 75. Only homeless migrants could have been included as Alaska residents, had such persons been present in the state. The relevant rule assigns "Persons in places which have shifting populations composed mainly of persons with no fixed residence, such as convict camps, highway and other construction camps, and camps for migratory agricultural workers," a residence in the camp where they are found. *Id.* [Rule 16] at 77. The thought that any significant number of people could have been encountered in agricultural or construction camps in Alaska on April 1, 1970 defies experience.

29. Bureau of the Census, *supra* note 25 at v.

30. The census does place college students where they attend school. The Board made an effort to determine the percentage of college students who were nonresidents. The number was found to be statistically insignificant.

31. Wilson v. Wilson, 10 Alaska 616, 621 (D.C.Anch.1945). The legislature in enacting AS 09.55.160 rendered nugatory the portion of *Wilson* which held that a serviceman may not sue for divorce within the state of assignment. *See* Lauterbach v. Lauterbach, 392 P.2d 24 (Alaska 1964).

military.[32] Most of these courts accept the principle that those in the military may acquire a domicil of choice where they are billeted, but the first Restatement of Conflict of Laws denied even that opportunity to some,[33] and the Second Restatement considers a new domicil "difficult to establish." [34] The principle that a military person retains his entrance domicil and residence has been embodied in a federal statute which exempts servicemen from virtually every form of taxation on income or personal property in the state where they are stationed unless they are domiciled there.[35]

As a result of the common and statutory law and the economics of military life, the serviceman and his family may remain completely aloof from the state of assignment, neither utilizing its services nor contributing to its treasury or public life.

We hold that it was reasonable for the Board to exclude some proportion of military personnel not merely because of their transience, but because a significant number of Alaska-based military personnel exercise an option to be non-Alaskans, despite their physical presence here. This phenomenon is well demonstrated by the minuscule voter registration on military

32. *See* Stifel v. Hopkins, 477 F.2d 1116, 1122 (6th Cir. 1973) ; Ellis v. Southeast Constr. Co., 260 F.2d 280, 281–282 (8th Cir. 1958) ; Prudential Ins. Co. of America v. Lewis, 306 F.Supp. 1177, 1184 (N.D.Ala.1969) ; Kopasz v. Kopasz, 107 Cal.App.2d 308, 237 P.2d 284, 285–286 (1951) ; Means v. Means, 145 Neb. 441, 17 N.W.2d 1, 3 (1945) ; Israel v. Israel, 255 N.C. 391, 121 S E.2d 713, 715–716 (1961) ; Wiseman v. Wiseman, 216 Tenn. 702, 393 S.W.2d 892, 895 (1965).

33. Restatement of Conflict of Laws, § 21 comment *c*. (1934).

34. Restatement (Second) of Conflict of Laws, § 17 comment *d*, (1971) :
A soldier or sailor, if he is ordered to a station to which he must go and live in quarters assigned to him, will probably not acquire a domicil there though he lives in the assigned quarters with his family. He must obey orders and cannot choose to go elsewhere. On the other hand, if he is allowed to live with his family where he pleases provided it is near enough to his post to enable him to perform his duties, he retains some power of choice over the place of his abode and may acquire a domicil. To do so, however, he must regard the place where he lives as his home. Such an attitude on his part may be difficult to establish in view of the nomadic character of military life and particularly if he intends, upon the termination of his service, to move to some other place.
We recognize, of course, that durational requirements for establishment of residence or domicil often suffer constitutional defects. State v. Adams, 522 P.2d 1125 (Alaska 1974) ; State v. Van Dort, 502 P.2d 453 (Alaska 1972). We deal here not with a durational requirement, but with the question of whether an individual may be considered a resident for purposes of apportionment.

35. 50 U.S.C.A. App. § 574 provides :
(1) For the purposes of taxation in respect of any person, or of his personal property, income, or gross income, by any State, Territory, possession, or political subdivision of any of the foregoing, or by the District of Columbia, such person shall not be deemed to have lost a residence or domicile in any State, Territory, possession, or political subdivision of any of the foregoing, or in the District of Columbia, solely by reason of being absent therefrom in compliance with military or naval orders, or to have acquired a residence or domicile, in, or to have become resident in or a resident of, any other State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, while, and solely by reason of being, so absent. For the purposes of taxation in respect of the personal property, income or gross income of any such person by any State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, of which such person is not a resident or in which he is not domiciled, compensation for military or naval service shall not be deemed income for services performed within, or from sources within, such State, Territory, possession, political subdivision, or District, and personal property shall not be deemed to be located or present in or to have a situs for taxation in such State, Territory, possession, or political subdivision, or district. Where the owner of personal property is absent from his residence or domicile solely by reason of compliance with military or naval orders, this section applies with respect to personal property, or the use thereof, within any tax jurisdiction other than such place of residence or domicile, regardless of where the owner may be serving in compliance with such orders . . . .

enclaves. It is thus not offensive to notions of equal protection to exclude from the population base even military personnel who have lived in Alaska for substantial periods of time, so long as those people have exercised their option to remain residents and domiciliaries of other states.

We turn, then, to the specific exclusion effected by the Board. The Board requested the military authorities in Alaska to compile and furnish data on Alaska's military and military-related population, and to furnish comments and suggestions concerning methods of identifying state residents among them. The Alaska Command reported that as of July 1, 1973, of the 18,581 uniformed military persons at the five major installations in Anchorage and Fairbanks, only 200, or 1.07 percent, are reflected as Alaska residents in personnel records. Since such figures probably are not promptly changed when personnel decide on a change of residence, they are of somewhat dubious value. They do show, however, that a substantial portion of the military population do not regard themselves as residents of Alaska.

The Board finally adopted a modification of a plan employed by the State of Washington in its recent reapportionment. The Washington plan was based on the premise that in any group of citizens approximately the same number will register to vote.[36] Therefore, the number of citizens could be extrapolated from the number of registered voters if the number of registered voters was known, but the number of residents was not. The statewide ratio of citizens to registered voters was 2.2:1. This ratio was then applied to the number of registered voters in the Fort Lewis-McCord Field military complex and in other military establishments occupying complete census enumerating districts. The number of military state residents (2.2 times the number of registered voters) was then subtracted from the total number of military persons present in the state, and the difference was deemed to represent the number of transient military personnel. The computation resulted in the exclusion of 58,507 persons—estimated to be nonresidents of the total of 60,143 military personnel. A corresponding downward adjustment was effected in the districts in which they had been counted (only 1,636 were included in the population base). A three-judge federal court adopted the reapportionment plan containing this formula which had been the result of a stipulation of some of the parties to the case. Two intervenors who were not parties to the stipulation appealed to the United States Supreme Court alleging in part that the method used unconstitutionally failed to include all of the military personnel. On appeal, the United States Supreme Court without opinion affirmed the order adopting the statistical reapportionment method.[37]

---

36. We do not find the dissent's suspicion of voter registration as an index of state citizenship of military personnel tenable. First, there is no contention that military personnel are subjected to some invidious discrimination in voter registration. In fact, there is evidence in the record that special efforts have been made to convince military personnel to register to vote, and that those efforts have failed. Nor do we consider the low percentage of registration or voting in bush areas to have any bearing upon the fairness of a voter-registration-based statistic, since the travel, communication, language, and cultural barriers of residents of those areas are not experienced by the vast majority of Alaska's military personnel. In any event, any statistical skew produced by low registration or voting in bush areas would lead, in the Board's exclusion formula discussed *infra*, to a result more favorable to military personnel as a class than that which would obtain if larger numbers of civilians registered and voted. There is every reason to believe that military personnel who desire to be Alaska residents and domiciliaries will register to vote because voter registration is a prime index of intention to become a resident or domiciliary. For like reason, we think that those who do no want to become Alaskans demonstrate that intention by refusing to register to vote. *See* Egan v. Hammond, 502 P.2d at 862 n. 2 for an example of the dismal results of efforts to register military persons as Alaska voters. Similar examples appear in the record of this case.

37. Washington State Labor Council AFL–CIO v. Prince, 409 U.S. 808, 93 S.Ct. 63,

The Alaska Advisory Board ascertained that the ratio between those registered to vote in the November 1970 Alaska election and the number counted in the April 1970 census was 1 to 2.717. This ratio was applied to those registered to vote in six locations populated exclusively by the military and their dependents.[38] A total of 1,049 persons were registered to vote in those military areas, thereby indicating 2,850 state residents (1,049 x 2.717). The census population within the sample area was 41,659, of whom 25,234 were estimated to be adults. Utilizing only the adults in the sample area, the Board found that approximately 11 percent were estimated to be residents (2,850/25,234), and accordingly 89 percent were nonresidents. Applying the 89 percent nonresidency factor to each place in which military personnel were counted resulted in a deduction of 28,581 from the total uniformed military population and corresponding deductions in each census district.

 There are obviously certain assumptions which had to be made in evolving the formula used, and admittedly there are inexactitudes. Any error, however, is bound to have resulted in more military and their dependents being counted than are actually residents of the state. For instance, the exclusionary formula was applied only to uniformed military personnel and not their dependents. Dependents of military persons may be assumed, for the most part, to have the same residential characteristics as the uniformed personnel upon whom they are dependent. There was an approximate total of 78,998 military and dependents counted in the 1970 census. Since but 28,581 were deducted, the actual percentage counted as residents was approximately 65 percent. Based on all statistical information available, this percentage is in all likelihood much higher than the actual percentage of military and military dependents who are residents of the state.[39] While an exclusion of a larger percentage of military personnel and dependents may be justified, we have not been presented with an issue as to overrepresentation of the military. We conclude that there was no discrimination against all military as a class and no improper exclusion of military personnel based on the nature of their employment.

## IV

## POPULATION VARIANCES

The 1973 reapportionment plan contains a maximum deviation in the House of Representatives of 29 percent, the Juneau district being underrepresented by 14 percent and the Nome district overrepresented by 15 percent. In the Senate, the maximum deviation is 22.4 percent.[40] Of 40 house seats, 22 derive from districts where representation deviates by five percent or more from the mean, and of 20 senate seats, 11 are situated in districts characterized by similar deviations. Since the deviations in both the house and the senate were, of course, both below and above the mean, the total deviations between several pairs of districts were in excess of ten percent. Appellants contend that such variances in population dilute and impair the right to vote of Alaskans in the underrepresented districts, in violation of the equal protec-

---

34 L.Ed.2d 68 (1972). *See also* In re Opinion of Justices, 111 N.H. 146, 276 A.2d 825 (1971), wherein the New Hampshire Supreme Court decided in an advisory opinion that excluding from the population base military personnel who have not met reasonable residence requirements was constitutionally permissible.

38. Approximately 60 percent of Alaska's military live in these six locations.

39. The largest claim to representation was detailed in our masters' report, where it was reported that 25 to 30 percent of military personnel and dependents in Alaska answered affirmatively to a census question whether their residence was the same in 1970 as it was in 1965. Assuming that pure duration creates voting residency, the 65 percent inclusion is more than double the allowance which could be argued for. *See* Egan v. Hammond, 502 P.2d at 886.

40. The Juneau senate district is underrepresented by 14 percent, and the Bethel district overrepresented by 8.4 percent.

tion clauses of the United States and Alaska constitutions.

In Egan v. Hammond, we discussed the then-applicable constitutional criteria, first delineating the unique problems involved in attempting to secure equal population districts in Alaska:

When Alaska's geographical, climatical, ethnic, cultural and socio-economic differences are contemplated the task assumes Herculean proportions commensurate with Alaska's enormous land area. The problems are multiplied by Alaska's sparse and widely scattered population and the relative inaccessibility of portions of the state. Surprisingly small changes in district boundaries create large percentage variances from the ideal population.[41]

We concluded:

Thus the present standard for reapportionment allows two separate justifications for deviation from the ideal population figures. The first is . . . variance occurring because of uncontrollable factors, despite a good faith effort to achieve mathematical precision. The second acceptable deviation is that which "the State must justify"—the implication being that while it was a controllable deviation, other factors "incident to the effectuation of a rational state policy" can be advanced in justification. However, as the Supreme Court cautioned at an early date in Reynolds v. Sims, acceptable state policies are greatly limited.[42]

Since our opinion in Egan v. Hammond, there have been three United States Su-preme Court opinions somewhat ameliorating the rigid standards previously applied. In the first of this trilogy, Mahan v. Howell,[43] a Virginia reapportionment plan involving a maximum variation of 16.4 percent[44] (one district was overrepresented by 6.8 percent and another underrepresented by 9.6 percent) was held to be justified by the state policy of following political subdivision boundary lines. The court recognized that the states had been accorded more latitude with respect to state legislative reapportionment than with respect to congressional redistricting.[45] While reaffirming the holding of Reynolds v. Sims that:

[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable.[46]

the court in Mahan emphasized that:

So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.[47]

In Gaffney v. Cummings,[48] the Supreme Court upheld a reapportionment plan for the Connecticut General Assembly involving a maximum deviation of 7.83 percent although a proposed plan had been submitted involving a much smaller deviation. In establishing the reapportionment plan, the apportionment board had followed a policy

41. 502 P.2d at 865 (footnote omitted).

42. *Id.* at 867 (footnote omitted). *See* Reynolds v. Sims, 377 U.S. at 579–580, 84 S.Ct. at 1390–1391, 12 L.Ed.2d at 537–538.

43. 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), modified, 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973).

44. *But see* opinion of Brennan, J., dissenting, indicating that the maximum variation might well have been 23.6 percent. 410 U.S. at 336, 93 S.Ct. at 991, 35 L.Ed.2d at 337.

45. 410 U.S. at 322, 93 S.Ct. at 984, 35 L. Ed.2d at 329.

46. 410 U.S. at 324–325, 93 S.Ct. at 985, 35 L.Ed.2d at 330, *quoting from* Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536.

47. *Id., quoting from* Reynolds v. Sims, 377 U.S. at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537.

48. 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

of "political fairness" aimed at establishing "a rough scheme of proportional representation of the two major political parties." [49]

The Supreme Court concluded:

> We think that appellees' showing of numerical deviations from population equality among the Senate and House districts in this case failed to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment, whether those deviations are considered alone or in combination with the additional fact that another plan could be conceived with lower deviations among the State's legislative districts. Put another way, the allegations and proof of population deviations among the districts fail in size and quality to amount to an invidious discrimination under the Fourteenth Amendment which would entitle appellees to relief absent some countervailing showing by the State.[50]

Although the Court found in its previous decisions the principle that, "[T]he larger variations from substantial equality are too great to be justified by any state interest so far suggested", nevertheless it also held that, "[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination. . . ." [51] The Court recognized that state reapportionment is the task of the organ of state government selected to perform it,[52] and that even though a slightly better plan could be created, that fact did not establish an invidious discrimination under the fourteenth amendment.

▮ Finally, in White v. Regester,[53] a Texas reapportionment plan was upheld al-

though it contained a maximum population variance between the largest and smallest district of 9.9 percent. No acceptable state policy was advanced to support the deviations. However, only 23 districts were over or underrepresented by more than three percent, and only three of those districts by more than five percent. The Court held that it did not consider relatively minor population deviations among state districts to so dilute the franchise in underrepresented districts so that individuals in those districts were deprived of fair and effective representation:

> Very likely, larger differences between districts would not be tolerable without justification "based on legitimate considerations incident to the effectuation of a rational state policy," Reynolds v. Sims, 377 U.S. at 579, 84 S.Ct., at 1391, 12 L. Ed.2d 506; Mahan v. Howell, supra, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320, but here we are confident that appellees failed to carry their burden of proof insofar as they sought to establish a violation of the Equal Protection Clause from population variations alone.[54]

According to Justice Brennan, *White* established a rigid demarcation line:

> [T]he Court today . . . reason[s] . . . that a showing of as much as 9.9% total deviation still does not establish a prima facie case under the Equal Protection Clause of the Fourteenth Amendment. Since the Court expresses no misgivings about our recent decision in Abate v. Mundt, 403 U.S. 182, 91 S. Ct. 1904, 29 L.Ed.2d 399 (1971), where we held that a total deviation of 11.9% must be justified by the State, one can reasonably surmise that a line has been

---

49. *Id.* at 738, 93 S.Ct. at 2324, 37 L.Ed.2d at 303.

50. *Id.* at 740, 93 S.Ct. at 2325, 37 L.Ed.2d at 304–305.

51. *Id.* at 745, 93 S.Ct. at 2327, 37 L.Ed.2d at 307.

52. *Id.* at 751, 93 S.Ct. at 2330, 37 L.Ed.2d at 311. The Court pointed out that constitutional violations could occur even though dis-

tricts were equal or substantially equal in population as, for example, when multi-member districts are so establised as to invidiously minimize the voting strength of racial or political groups.

53. 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314.

54. *Id.* at 764, 93 S.Ct. at 2338, 37 L.Ed.2d at 323.

drawn at 10%—deviations in excess of that amount are apparently acceptable only on a showing of justification by the State; deviations less than that amount require no justification whatsoever.[55]

We conclude that in the absence of a showing that the manner of reapportioning a state was improperly motivated or had an impermissible effect, deviations of up to ten percent require no showing of justification.[56] The state, however, has the burden of showing that deviations in excess of ten percent are "based on legitimate considerations incident to the effectuation of a rational state policy".

■ We thus must ascertain whether the state has met its burden of justification here. As indicated in our order of June 6, 1974, we find that House districts No. 22 (Nome), No. 16 (Bristol Bay), No. 12 (Anchorage West), No. 20 (Fairbanks), No. 11 (Anchorage South), No. 9 (Anchorage Spenard), and No. 17 (Bethel), and Senate districts J (Anchorage West), M (Bristol Bay-Bethel), O (Fairbanks), G (Anchorage Spenard)· and I (Anchorage South) are malapportioned in excess of a 10 percent maximum comparative variance, and that the appellees failed to demonstrate that the individual variances from the mean in those districts were based on legitimate considerations incident to the implementation of a rational state policy.[57]

■ We find it necessary to discuss briefly the reasons advanced by the Advisory Board in attempting to justify the disparities in each of the districts referred to above. We are convinced that the Board made a good faith effort, but unfortunately we find that the reasons advanced by the Board do not withstand close scrutiny under the standards enunciated by the United States Supreme Court. In many instances, one of the principal reasons advanced by the Board was the preservation of the boundaries of regional corporations established under the Alaska Native Claims Settlement Act. Under that Act, the state was divided into 12 regions, and separate corporations were established for each region. By the division it was sought to establish homogeneous groupings of Native[58] peoples having a common heritage and sharing common interests.[59] The use of such corporate boundaries in districting might constitute justification for some population deviation. Following corporate boundaries was stated as a reason for the composition of House districts 22 (Nome), which was 15 percent overrepresented, 16 (Bristol Bay), which was 10.9 percent overrepresented, and 17 (Bethel), which was 6.3 percent overrepresented. We find, however, that none of those districts has the boundaries of a Native corporation. Each included substantial portions of more than one corporate region.

Additionally, it was suggested that the Nome area had a unique Native composition. But the makeup of the population both to the north and east does not vary significantly from that of the adjoining villages within the Nome boundaries. The mining potential in the area and the need for a "common port facility" do not constitute considerations incident to the implementation of a rational state policy so as to justify a disparity of 15 percent overrepresentation.

---

55. *Id.* at 776, 93 S.Ct. at 2345, 37 L.Ed.2d at 331 (Brennan, J., dissenting).

56. The challengers' briefs are silent on the issue of whether the governor's plan had the purpose or effect of discriminating impermissibly against any racial, ethnic or political group. At oral argument, counsel for the challengers, who is also a state senator from Anchorage, conceded that the record did not demonstrate any such discrimination.

57. The attempted justifications are to be found in the report and proposed plan of the Governor's Advisory Reapportionment Board. The testimony at the trial of this case produced little if any evidence to supplement the justifications set forth in the report.

58. "Native" is basically defined in the Act as a citizen of the United States who is ¼th degree or more Alaska Indian, Eskimo or Aleut, or combination thereof. 43 U.S.C.A. § 1602(b).

59. 43 U.S.C.A. § 1606.

No valid reasons were advanced for the 10.9 percent overrepresentation with reference to House District 16 (Bristol Bay). We can agree with the Board's decision not to combine the Bristol Bay area with the Aleutian Chain because of conflicts between the residents of the two areas, but that does not explain why other areas could not have been added to the district so as to create less of a variance.

District 20 (Fairbanks) is a multi-member district electing six house members. It is 7.4 percent overrepresented, and no valid reasons were set forth as to why additional areas could not be included so as to reduce the variance.

The explanation advanced for District 17 (Bethel) having 6.3 percent overrepresentation was the inclusion of a portion of the Calista Native Corporation Region and utilization of one of the boundaries of that region. In view of the fractionation of Calista revealed by reference to the maps, the reason advanced cannot justify the discrepancy under the Supreme Court guidelines.

Finally, Anchorage districts 9, 11 and 12 were underrepresented respectively by 5.9, 6.5 and 8.6 percent. Having made the policy decision to divide Anchorage into six districts, the Advisory Board endeavored to identify like socio-economic areas, based on the cost of housing, the concentration of minorities, income levels, the need for transit systems and growth and development plans. It is clear from the testimony, however, that there are few if any homogeneous areas within the Anchorage Borough; the patterns of housing, income levels and minority residency criss-cross extensively.

The Board's apparent effort was directed at compliance with the Alaska constitutional mandate that districts contain "as nearly as practicable a relatively integrated socio-economic area."[60] Some guidance as to the meaning of the term "socio-economic area" may be garnered from the minutes of the Constitutional Convention.

It appears that Delegate Hellenthal advocated the use of the term, describing it as follows:

> [w]here people live together and work together and earn their living together, where people do that, they should be logically grouped that way.[61]

> • • • • • •

> It cannot be defined with mathematical precision, but it is a definite term, and is susceptible of a definite interpretation. What it means is an economic unit inhabited by people. In other words, the stress is placed on the canton idea, a group of people living within a geographic unit, socio-economic, following if possible, similar economic pursuits. It has, as I say, no mathematically precise definition, but it has a definite meaning.

> • • • • • •

> It is in common use among political scientists.

> • • • • • •

> I think it is a political and economic term rather than a legal term.[62]

It would appear from that discussion that a community such as the Greater Anchorage Borough might be considered as a socio-economic area, but that it becomes extremely difficult to fragment the area with geographic nicety according to the patterns endeavored to be followed by the Board. As was stated in The Report of the Masters, appended to the decision in Egan v. Hammond: "Close scrutiny of population characteristics in Anchorage do [sic] not reveal clearly delineated ethnic ghettos."[63] And at least as far as the election of legislators is concerned, Alaska does not seem to be afflicted with the racial miasma adversely affecting other sections of the United States.[64]

---

60. Art. VI, § 6 Alaska Const.

61. Minutes, Constitutional Convention 1836.

62. *Id.* at 1873.

63. 502 P.2d at 894.

64. Many Alaska Natives have been elected to the legislature, and two have been elevated

■ The testimony in the court below indicated that there are few if any homogeneous socio-economic areas within the Greater Anchorage Area Borough, and that patterns of housing, income levels and minority residency are difficult to delineate. While such patterns may form a basis for districting, they lack the necessary significance to justify the substantial disparities of 5.9, 6.5 and 8.6 percent. In an urban area such as Anchorage, more mathematical exactness can be achieved than in the sparsely settled portions of the state where pockets of culturally and economically divergent populations may be separated by geographic barriers. We hold that appellees have failed to meet the constitutional burden of justifying the discrepancies found in Districts 9, 11 and 12.

■ On the other hand, we do find that the burden was met with reference to House districts 2 (Wrangell-Petersburg), 4 (Juneau), 14 (Kodiak), and 15 (Aleutian Chain). With reference to the Juneau and Wrangell-Petersburg areas, the Board was confronted with the difficult problem of juggling the more contiguous, compact, relatively integrated socio-economic areas of Southeast Alaska without extending a substantial distance into an unrelated area separated by immense natural barriers. Yakutat, the northwestern-most settlement in Southeast Alaska, which is itself separated by great distance from the other communities in the region, is 225 air miles from the nearest population center in the Southcentral region, Cordova. There are valid considerations both historically and geographically for not endeavoring to span

that gap. Within the Southeast area, Juneau is substantially underrepresented, exceeding the norm for a two-member district by 14 percent. The Board, however, presented a rational basis for not severing Skagway and Haines from the district, the only logical alternative which would reduce the underrepresentation. There are close transportation ties between Juneau, Haines and Skagway by daily scheduled air flights and frequent ferry service; a Juneau-Haines highway connection has been planned. The district is quite distinct from the rest of the Southeast region by virtue of the nature of its development and the fact that it is almost entirely composed of portions of the mainland, rather than the islands of the archipelago; historically the three communities have always been closely linked, with Juneau serving as an economic hub for Haines and Skagway.

District 2 (Wrangell-Petersburg) is the other Southeastern district with a substantial deviation—9.3 percent overrepresentation. The Board stated valid considerations for this variation, which necessarily implemented the rational state policy, expressed in the Alaska Constitution, of achieving, as nearly as practicable, contiguous, compact territory containing a relatively integrated socio-economic area.[65]

We likewise find adequate justification for the 6.5 percent overrepresentation in the vast and remote Aleutian Chain District. The district includes all of the area of the Aleut League Corporation. There appears to be no feasible means of adding additional areas of population to this district without worsening the imbalance al-

---

to the position of President of the Senate. Appellants point out that a black was elected to the House from a district with an insignificant minority population. [Hedland Dep. 34]

65. As the Board explained:
The orientation of this entire district is fishing, fish :processing, forest products, and tourism, and nearly all of its communities partake of all of these activities. They are integrated by the Southeast System of the Alaska Marine Highway and by numerous air taxi operators and a scheduled commercial airlines. The population is a

mixture of natives and non-native [sic]. The only option for reducing the slight overrepresentation which the district may enjoy would be to reach into the Juneau district from the south or west, taking part of Douglas, Juneau, or Haines. Such a course would either effectively disenfranchise that part of Douglas or Juneau engrafted to the district or would require a bisection of the Haines Borough, further submerging its institutional voice in the legislature. Extending into Prince of Wales Island or the Sitka district would only magnify the slight numerical advantage already inevitable for those districts.

ready present in District 14 (Kodiak). By the same token, Kodiak, which is overrepresented by 5.7 percent, does not readily present an alternative, as it is surrounded by the Aleutian Chain District.

Since the senate districts combined house districts and utilized the same boundaries, the identical reasons for approving or disapproving the disparities are applicable. We thus find it necessary to hold that Senate Districts G (Anchorage Spenard), I (Anchorage South), J (Anchorage West), M (Bristol Bay-Bethel), and O (Fairbanks) exceed permissible constitutional limits as to population variances, and that appellees have failed to demonstrate that such variances are based on legitimate considerations incident to the implementation of a rational state policy.

## V

## DISTRICTING OF THE GREATER ANCHORAGE AREA

Appellants complain of the division of Anchorage into six election districts, contending that the area constitutes one integrated socio-economic area which should not be fragmented.

■ We have previously upheld the authority of the governor to create single-member districts from multi-member districts.[66] The power to create such single-member districts applies to integrated soci-economic areas as well as to other areas. We do not construe the Alaska constitutional requirement that districts be formed from contiguous, compact, relatively integrated socio-economic areas to prohibit smaller districts within such areas. The smaller districts would still conform to the constitutional standard. It is conceivable, for example, that the population of Anchorage could vastly increase. It surely could not have been contemplated by the framers of the Constitution that a compact, contiguous, and socio-economically integrated metropolis of perhaps 500,000 persons could not be districted.

■ The Advisory Board was confronted with competing policy considerations with reference to the desirability of keeping the ballot simple, encouraging qualified candidates to run for public office, and ensuring maximum voter participation, as opposed to avoiding undue fragmentation of the community. The majority of the Board found that:

At-large representation would produce an unwieldly primary ballot with well over 100 candidates. Two districts—each to elect eight representatives and four senators—would still produce a cumbersome total of candidates and would be a more complicated ballot than is presented to voters in any part of Alaska.

The governor adopted the plan advocated by a majority of the Board, whereby the city was divided into six districts. While substantial arguments have been advanced both for and in opposition to the Board's decision, we cannot say that it is not based on rational as opposed to arbitrary considerations. Therefore, under the standard of review which we have adopted, the decision of the Board must be upheld.

Arguments have also been advanced as to the manner of delineating the districts, aside from the population imbalances discussed previously. We do not find that the boundaries lack a rational basis. Since we are not free to impose our judgment as to the wisdom of the particular partitions, we cannot entertain the argument that Anchorage could have been divided more prudently.

The superior court did not err in upholding this portion of the reapportionment plan.

## VI

## THE TERMINATION OF SENATORIAL TERMS

Because the reapportionment plan substantially altered the senatorial districts in the Greater Anchorage area, the governor

---

66. Egan v. Hammond, 502 P.2d at 873.

ordered that new elections must be held in 1974 for all senate seats in these districts. Formerly, the area constituted one senatorial district from which eight senators were elected, four being selected to four-year terms at each biennial election. The four incumbents whose terms would otherwise have extended to 1976 thus had the balance of their terms of office truncated.

Appellants contend that there was no need to terminate senatorial terms. The principal argument advanced, however, is not directed to the authority of the governor to terminate the terms of incumbents under the Anchorage reapportionment plan establishing six new districts, but to the appellants' preference that members of the senate should represent "larger, broader, socio-economic constituencies and should be elected area wide." Reference is made to a Senate Resolution expressing similar sentiments.[67]

While the governor might have favorably considered the policies of having senators from Anchorage elected at large, there were valid reasons for him to exercise his discretion by dividing the area into six districts. In the previous section of this opinion, we stated our reasons for upholding the governor's decision to redistrict the Anchorage area. Once this portion of the reapportionment plan has been approved, appellants' principal argument evaporates. Since the district from which the four holdover senators were elected no longer exists and the new districts have vastly changed boundaries, it was within the governor's discretionary authority to require mid-term elections. When confronted with the same question in Egan v. Hammond, we stated:

> A need to truncate the terms of incumbents may arise when reapportionment results in a permanent change in district lines which either excludes substantial numbers of constituents previously rep-

resented by the incumbent or includes numerous other voters who did not have a voice in the selection of that incumbent. The discretionary authority to require mid-term elections when necessary is well established.[68]

Counsel refers to the decision of the Supreme Court of California in Legislature v. Reinecke.[69] There a masters-recommended reapportionment plan which provided for hold-over senators to continue to serve for the balance of their terms was upheld as having a rational basis. The court considered the desirability of continuing the orderly operation of the four-year staggered term system whereby half of the senators would hold over at each session. Although it recognized a "resulting inequality among electors", the court found that the mere two-year duration of such inequality was not sufficiently egregious to require truncation of terms.[70]

If we had the original decision to make, we might well be persuaded by similar reasons to have the four senators continue to serve the balance of their terms. We conclude, however, that valid reasons were presented for truncating the terms and, accordingly, we affirm the trial court's decision upholding that portion of the reapportionment plan.

Affirmed in part and reversed in part.

ERWIN, J., with whom CONNOR, J., joins, dissenting.

## ORDER

This case is before the Supreme Court of Alaska on appeal from a judgment entered by Superior Court Judge James K. Singleton in favor of appellees. Appellants below have raised a number of objections to the proclamation of reapportionment and redistricting issued by Governor William A. Egan on December 11, 1973, adopting a plan submitted by the Gover-

---

67. S.Res. 1, 8th Legis.2d Sess. (1974).

68. 502 P.2d at 873–874 (footnote omitted).

69. 10 Cal.3d 396, 110 Cal.Rptr. 718, 516 P.2d 6 (1973).

70. *Id.* 110 Cal.Rptr. at 723–724, 516 P.2d at 11–12.

nor's Advisory Reapportionment Board. After considering the briefs of the parties and hearing oral argument, a majority of the Supreme Court affirms the decision of Judge Singleton on the following issues:

1. The use of the 1970 census data.

2. The use of the formula establishing the number of military personnel and dependents to be included in the population base.

3. The authority of the Governor to establish multiple senatorial districts within the greater Anchorage area.

4. The authority of the Governor to truncate senatorial terms when the districts from which the senators were elected have been substantially changed.

We hold, however, that the superior court's conclusion that all House and Senate districts have been properly apportioned is erroneous. Specifically, House districts No. 22 Nome, No. 16 Bristol Bay, No. 12 Anchorage—West, No. 20 Fairbanks, No. 11 Anchorage—South, and No. 9 Anchorage—Spenard, and No. 17 Bethel and Senate districts J Anchorage—West, M Bristol Bay—Bethel, O Fairbanks, G Anchorage—Spenard, and I Anchorage—South exceed permissible constitutional limits as to population variances as delineated by decisions of the United States Supreme Court.[1] Appellees have failed to demonstrate that such variances in the plan are based on legitimate considerations incident to implementation of a rational state policy.

The case is remanded so as to enable the Governor of the State of Alaska, if he so desires, to re-submit the plan to the Advisory Reapportionment Board for the purpose of revising it to bring the districts specified above within constitutional standards.

In revising the proposed plan the Board may alter any district to correct population imbalances. Every effort shall be made to insure that maximum variances in the districts set out above shall not exceed ten (10) per cent. There shall not be a spread exceeding ten (10) per cent in the population of any over-represented district and any under-represented district, excluding the districts of Southeast Alaska, District 14 Kodiak, and District 15 Aleutian Chain, unless such variance is based on legitimate considerations incident to a rational state policy with specific reasons in justification being stated. In assessing permissible population variances the Board may disregard deviations in districts located in Southeast Alaska, District 14 Kodiak, and District 15 Aleutian Chain because variances in those districts are based upon legitimate considerations incident to implementation of a rational state policy. Changes may be made in other districts as may be found necessary.

Unless a revised plan is returned to the court on or before June 20, 1974, the interim plan promulgated by this court by Order Establishing An Interim Reapportionment Plan For 1972 Legislative Elections, dated June 14, 1972,[2] shall be effective for the 1974 legislative elections. Objections to the June 20, 1974, deadline shall be filed on or before three (3) days from the date of this order, setting forth reasons why some date other than June 20, 1974, would be more appropriate. In the event an alternative plan is submitted by the Governor to this court, the court will receive written comments or objections from appellants if filed by 12:00 noon on June 24, 1974. In the event an alternative plan is submitted by the deadline, the court will

1. White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

2. Egan v. Hammond, 502 P.2d 856, 927–929 (Alaska 1972).

review it and take whatever action is appropriate.

A full opinion shall follow including dissents of individual justices on different points raised by this appeal.

Dated this 6th day of June, 1974.

ERWIN, Justice, with whom CONNOR, Justice, joins (dissenting).

I dissent from the majority opinion on the ground that the exclusion of all but a small percentage of the military from the reapportionment plan's population base violates the equal protection clauses of the United States and Alaska Constitutions.[1]

In Egan v. Hammond,[2] this court recognized that military personnel as a class cannot be denied the right to vote in a state election or be arbitrarily eliminated from the population base in a reapportionment plan solely because of their military status, although some military may be excluded as a permissible device for limiting the impact of transients and non-residents. One plan suggested in *Egan* for achieving this goal was to limit the population base to state citizens by adopting a registered voter base, even though such a base inherently eliminates a much higher proportion of the military than civilians. But, as we were careful to point out, the equal protection clause of the United States Constitution, and presumably the Alaska Constitution, require specific factual justification for eliminating any portion of the military from the population base. When a particular class of the state's population—namely the military—is singled out in a reapportionment plan for exclusion on the basis of the nature of their employment alone, the burden is squarely upon the proponents of the plan to demonstrate the reasonableness of that course of action, because such an exclusion is prima facie invalid. In the absence of sufficient justification, the military must receive the same treatment as their civilian counterparts.[3]

My examination of the record reveals that appellees clearly failed to justify application of any version of the Washington formula in Alaska. I thus cannot agree with the majority's assumption that the basic principle of the formula is as applicable to Alaska as it was to Washington. On the contrary, I find the majority's acceptance of the formula without sufficient proof of its validity in Alaska to be remarkable in itself, for in upholding many other aspects of the proposed reapportionment plan the majority has repeatedly emphasized Alaska's uniqueness.[4]

I also cannot accept the Board's tolerance of civilian transients while at the same time excluding apparent military transients from the population base. As we indicated in Egan v. Hammond, population bases grounded upon state citizenship are acceptable only when supported by accurate and statistically reliable data for discriminating between citizens and transients.[5] In this case, the Board's assumption that military but not civilian transients would distort the population base is without foundation or justification in

1. I harbor further misgivings about whether some of the election districts in the reapportionment plan are "relatively integrated socioeconomic areas," as required by article VI, section 6 of the Alaska Constitution. However, since a number of these districts have been found to have population deviations in excess of those allowed under federal constitutional standards and have been remanded to the Board for modification, I reserve judgment on this issue until I have had an opportunity to study the modified plan.

2. 502 P.2d 856, 869–870 (Alaska 1972).

3. *See* Mahan v. Howell, 410 U.S. 315, 330–332, 93 S.Ct. 979, 988–989, 35 L.Ed.2d 320, 333–334 (1973) ; Burns v. Richardson, 384 U.S. 73, 92 n. 21, 86 S.Ct. 1286, 1296 n. 21, 16 L.Ed.2d 376, 391 n. 21 (1966) ; Carrington v. Rash, 380 U.S. 89, 95–96, 85 S.Ct. 775, 779–780, 13 L.Ed.2d 675, 679–680 (1965) ; Davis v. Mann, 377 U.S. 678, 691, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609, 617 (1964) ; Egan v. Hammond, 502 P.2d 856 860, 869 (Alaska 1972).

4. See the discussion in Egan v. Hammond, 502 P.2d 856, 865 (Alaska 1972), emphasizing Alaska's uniqueness.

5. 502 P.2d at 870–871.

the record. And the majority's effort to justify the Board's tolerance toward civilian transients with documentation on Alaska's employment patterns which is not part of the record is patently inconsistent with their earlier conclusion that the duty of this court is to exercise *de novo* jurisdiction based "upon the record developed in the superior court." [6]

In fact, the record is almost completely devoid of data on civilian transients. For example, there is little, if any, support for the majority's observation that at the time of year when the census was taken—April —most of the civilian transient elements were absent from the population base. Without concrete data it cannot be merely assumed that migrants and seasonal employees are not present in the state in significant numbers during the month of April, for it is common knowledge that an increasing number of transients are present in Alaska during the winter months. It also cannot be assumed that because the census counts a person at the place "he lives and sleeps most of the time" most of the civilian transients are necessarily excluded from Alaska's population base. As the majority itself points out, the census enumerates not only those migrants who claim ties to no other state but also those individuals who maintain a permanent residence elsewhere and spend a majority of their time in Alaska. Yet the record reveals that the Board made no effort to determine the impact of these transient groups upon the population base. Surely these transients have no greater contacts with the state than military residents who live here on a year-around basis and whose children attend local schools.[7]

The majority attempts to justify the inclusion of these transient groups in the population base by concluding that it would be a "herculean task" to determine who among them actually consider themselves citizens of Alaska. Again the record fails to support the majority. The record reveals that Robert Sharp, City Manager of Anchorage, testified before the Board that it cost the City only $40,000 in 1968 to conduct a door-to-door canvass of the entire Anchorage area, which has approximately 65 per cent of Alaska's population.[8] Assuming this to be a fair measure of the cost of surveying the incidence of state citizenship among civilians, it becomes apparent that such a survey would hardly be a "herculean task." Even if it were, however, the greater difficulty of determining the incidence of state citizenship among the civilian population is a weak excuse for singling out the military for discriminatory treatment.[9]

The majority goes on to assert that the dissent "ignores the fundamental reason for the exclusion of military personnel— their want of any contact with the state." In support of this cold assertion they cite to a body of law which, in short, indicates only that the involuntary nature of military assignments points toward retention of the domicile established prior to entering the service. They also cite to a federal statute exempting servicemen from various forms of state taxation and then sum-

---

6. The majority has attempted to bring this material within the reviewable record by judicial notice under Civil Rule 43(a)(2) [c] and [d]. Since this material is reasonably subject to dispute and its accuracy cannot be determined by resort to ˙ sources of indisputable accuracy, I do not believe it to be an appropriate subject of judicial notice.

7. Even the state's 3,752 aliens who were enumerated in the 1970 census and consequently included in the population base, were not, like the military, subjected to a state citizenship test. Egan v. Hammond, 502 P.2d 856, 929 n. 2 (Alaska 1972).

8. Transcript of the June 29, 1973, hearing in Anchorage, at 24.

9. The Board did consider the effect of the state's transient college students. But even there, in deciding that their number was statistically insignificant, the Board rested its conclusion upon admittedly inconclusive data based upon durational residency requirements which have been specifically disapproved as criteria for determining voter eligibility. *See* State v. Van Dort, 502 P.2d 453 (Alaska 1972).

marily conclude that as a result of this law and the "economics of military life, a serviceman and his family may remain completely aloof from the state of his assignment . . . ."

This argument is unpersuasive for three basic reasons. One, it ignores the location of the burden of proof; two, it indicates a fundamental misunderstanding of the economic facts of military life; and three, it ignores the fact that the same argument can be made with regard to other classes of federal public servants who serve in Alaska for limited terms but were not excluded from the population base.

First, it is not disputed that a serviceman has an option to remain economically aloof from the state of his assignment, neither contributing to its treasury nor utilizing its services. But the burden nevertheless remains squarely upon the state to establish that each and every military person excluded from the population base in a reapportionment plan has in fact exercised this option. By silently condoning the state's failure to meet this burden, the majority is overruling our holding in Egan v. Hammond respecting the burden of proof on the military exclusion issue.

Second, no doubt the "economics of military life"—which presumably refers to the tax exempt status of servicemen and the bonuses offered nondomiciliaries stationed in Alaska—are largely responsible for the failure of many military personnel stationed in Alaska to publicly admit domicile by registering to vote. But what the majority fails to discern is that an unwillingness to register to vote is not conclusive of a serviceman's intentions or desire to become a state citizen. All that it demonstrates is a perfectly expectable reluctance,

even on the part of bona fide military residents, to risk losing significant economic advantages by registering to vote. The "economics of military life" indicate not that the military lack "any contact with the state beyond mere presence" but rather only that the military, both resident and nonresident, are subjected to unique economic pressures to which civilians are not exposed. Forcing military residents to withstand these pressures at the cost of surrendering their fundamental right to be included within the population base effectively penalizes them for exercising constitutional rights.[10]

Third, the same argument regarding minimum contacts with the state that the majority makes with respect to the military also applies to a body of federal public servants who serve for limited terms in Alaska and enjoy many of the same trappings and benefits as the military. Yet the majority ignores the fact that no attempt was made to exclude them from the population base. Certain employees of the federal Public Health Service and the Coast and Geodetic Survey, who enjoy military rank similar to Coast Guard rank, are assigned to Alaska for limited terms of duty, as are certain employees of the Federal Aviation Administration and the Army Corps of Engineers. Certainly these groups should be treated on a par with the military if the military are to be subjected to a state citizenship test.

The majority goes on to point out that the "largest claim" to representation of the military in the population base lies in the 25–30 per cent of military personnel and their dependents who at the time of the 1970 census had lived in the state for more than five years. They then note that the

10. Another disturbing aspect of "military economics" which is ignored by the majority is that, despite the fact that all military personnel are counted for the purpose of obtaining federal revenue sharing, they are now effectively denied representation in the legislative body which sets the priorities controlling the expenditure of this revenue. Basic fairness would appear to require that a state which accepts federal funds for the purpose of providing local services to military personnel should be required to assure an effective voice to the military in determining how these funds are to be spent. Counting a mere 11 per cent of the military in the population base falls far short of achieving this goal.

present plan includes a far larger percentage—65 per cent—of the military and their dependents than the 25–30 per cent that would be included if a 5-year residency were taken to be conclusive of state citizenship. The majority then observes that the opponents of the military exclusion formula have failed to argue for a higher inclusion figure than 25–30 per cent and imply that the formula is valid because, while it does not provide statistical certainty, it is more than generous to the military.[11]

Again the majority has lost focus of the location of the burden of proof. The burden is not upon the opponents of the plan to argue for a higher inclusion figure but upon the proponents to justify exclusion of any military. Even if it were to the contrary, however, the conclusion that the formula is valid because it resolves doubts in favor of increased military representation does not justify adoption of a formula which discriminates between military and civilian transients. The fact remains that the formula does not accurately reflect residency among the military. It is thus contrary to all notions of fairness and equal protection to utilize it in the reapportionment plan.

I also cannot accept the majority's assumption that voter registration can be taken as an indication of a person's state citizenship in Alaska. In the Hawaii reapportionment plan litigated in Burns v. Richardson,[12] the state's registered voters were accepted as a permissible population base only because this base purportedly produced a distribution of legislators not unlike that which would have resulted from the use of a more conventional population base such as state citizenship or total population. This correlation was undoubtedly due in part to the fact that Hawaii exerted a monumental reapportionment and voter registration effort.[13] The Court in *Burns* was quick to point out, however, that, even though it was accepting a voter registration base in Hawaii, it considered such a population base generally suspect:

> Such a basis depends not only upon criteria such as govern state citizenship, but also upon the extent of political activity of those eligible to register and vote. Each is thus susceptible to improper influences by which those in political power might be able to perpetuate underrepresentation of groups constitutionally entitled to participate in the electoral process . . .[14]

Thus, at the very least, a voter registration base must be shown to correlate with state citizenship, total population, or some other permissible reapportionment base.

The record amply demonstrates that no such showing has been made in this case. On the contrary, there is substantial evidence that voter registration does not correlate with state citizenship or total population. For example, Alaska alone among the northern states was singled out by the 1965 federal Voting Rights Act[15] as a state that possibly abridges the rights of its citizens to vote because of the low percentage of votes cast by its eligible voters.[16] Although Alaska has since rid itself of that dubious status by a declaratory judgment, that judgment remains reviewable.[17]

11. Note 20 of the majority opinion *supra*.

12. 384 U.S. 73, 92–93, 86 S.Ct. 1286, 1296–1297, 16 L.Ed.2d 376, 391 (1966).

13. See the discussion of this effort in Burns v. Gill, 316 F.Supp. 1285, 1289 (D.Hawaii 1970), *quoted in* Egan v. Hammond, 502 P.2d 856, 866 n. 16 (Alaska 1972).

14. 384 U.S. at 92–93, 86 S.Ct. at 1297, 16 L.Ed.2d at 391.

15. 42 U.S.C. § 1973 et seq. (1970).

16. 1965 U.S.Code Cong. and Admin.News, p. 2445.

17. On August 17, 1966, Alaska was granted a declaratory judgment by the District Court for the District of Columbia in Civil No. 101–66 removing it from coverage under the Voting Rights Act. When portions of the state were again included under a 1970 amendment to the Act, Alaska again secured a declaratory judgment from the same court in Civil No. 21–22–71 removing those portions of the state from coverage under the Act. This latter judgment remains reviewable for a period of five years following its entry. 42 U.S.C. § 1973a (1974).

Also, it is not uncommon for a particular segment of Alaska's citizens to exhibit a reluctance to register to vote. For example, statistics compiled from the 1970 census and the 1972 official primary and general election returns reveal that a very low percentage of Alaska's large aboriginal population registers to vote, although they are undeniably state citizens.[18] Without a showing that the military do not exhibit a similar reluctance to register, even though they are citizens, voter registration behavior alone cannot be used to estimate the number of state citizens among the military.

Further, Burns v. Richardson,[19] which recognized that if voter registration is indicative of state citizenship, it may be used as a reapportionment base, was decided before the United States Supreme Court and this court began to move toward de-emphasizing the role of state citizenship in the election process. The recent decisions of Dunn v. Blumstein[20] and State v. Van Dort,[21] which disapprove of durational residency requirements conditioning the right of franchise, severely restrict the use of objective state citizenship tests in determining voter eligibility. And State v. Adams[22] goes even further to suggest that no objective test for state citizenship which inherently infringes upon a fundamental right—e. g., franchise—should be permitted to condition the exercise of that right. Even more importantly, however, these cases squarely place the burden upon the proponent of such a test to demonstrate a compelling justification for it. While I am not persuaded that the compelling state interest standard should be applied to reapportionment, I believe that these cases nevertheless place a heavy burden of persuasion upon the proponents of any reapportionment plan based upon a state citizenship test to demonstrate that the test in fact excludes only non-citizens from exercising their fundamental right of franchise. In this case the proponents have quite clearly failed to meet this burden for they have established no reliable correlation between voter registration and state citizenship. I would thus hold that voter registration has not been demonstrated to be a sufficiently reliable population base for a reapportionment plan in Alaska and remand the case to the Board to change the population base.

Both this case and Egan v. Hammond pointedly illustrate the perils of expedited litigation. Twice within the space of two years this court has been called upon at the eleventh hour to review reapportionment plans under the pressures of an imminent election. And twice these pressures have forced us to make decisions on the basis of records which, in my opinion, have been inadequate. I, for one, hesitate to reach a decision on an issue as far-reaching and important as reapportionment without an adequate record. Were it not for the fact that small numerical variations in the apportionment of people between the election districts are greatly magnified by Alaska's comparatively small population, I would not be so insistent that the record provide adequate justification for each attempt by the Board to depart from the constitutionally mandated goal of mathematical equality. But since a variation of only 68 people causes a one per cent variation in the population of each election district in Alaska, great care must be taken to assure that the exclusion of each and every person from the population base is constitutionally permitted. If any reapportionment case reaches us in the future with an inadequate record like the present one, I will vote to remand the case for further findings.

18. For example, in the 1972 general election only about 19 per cent of the total populations in the predominantly aboriginal communities of Barrow and Bethel voted. Approximately 33 per cent of Alaska's total population voted in the same election.

19. 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

20. 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

21. 502 P.2d 453 (Alaska 1972).

22. 522 P.2d 1125 (Alaska 1974).

## OPINION

### ON OBJECTION TO THE REVISED REDISTRICTING PLAN PROCLAIMED ON JUNE 14, 1974

BOOCHEVER, Justice.

On June 6, 1974, we remanded this case to enable the governor of the State of Alaska to resubmit the reapportionment plan to the Advisory Reapportionment Board for the purpose of revising it to bring the population of districts specified in our order within federal constitutional standards. In the event a revised plan was submitted on or before June 20, 1974, written comments or objections were to be filed by 12:00 noon on June 24, 1974. The Advisory Reapportionment Board submit· ted to the governor of the State of Alaska its Proposed Revised Plan of Reapportionment and Redistricting which the governor adopted by proclamation on June 14, 1974. Objections were filed by the appellants. In addition, a notice of objection and a motion for leave to intervene as a party or to file an amicus curiae brief was also filed by the Kenai Peninsula Borough. After denying the Kenai Peninsula Borough motion to intervene but granting the Borough the right to file a memorandum as amicus curiae, the court, upon request for oral argument on the objections, specially heard such arguments on June 26. Counsel for the Borough was permitted to participate in the oral arguments.

The objections filed by the appellants pertained to the redistricting of the Anchorage area, the termination of Anchorage senate terms and the exclusion of some military personnel from the population base. None of these objections was addressed to the revisions set forth in the re-

vised plan proclaimed by the governor on June 14, 1974.[1] The objections reiterated and amplified arguments previously advanced against the original reapportionment plan of December 11, 1973. We have again carefully considered those objections and find no reason to alter our opinion with reference to the issues raised.

The Kenai Peninsula Borough objected to the portion of the revised plan which severed the southern end of the Kenai Peninsula from the Borough, the peninsula and House District No. 13 (Kenai-Cook Inlet) and joined it to House District No. 16 (Bristol Bay) in order to achieve a less-than-five-percent deviation in House District No. 16. The area transferred to District No. 16 comprised about 680 residents or slightly more than ten percent of the entire population of District No. 16, most of which is located across sea and mountains from the Kenai Peninsula area. The Borough points out that the residents of the Kenai area so transferred had interests similar to those of other residents of the Kenai-Cook Inlet District No. 13 and little in common with the residents of House District No. 16 (Bristol Bay). The Borough argues that the residents of the severed portion of House District No. 13 would be disenfranchised because their influence would not be of sufficient weight to receive attention from Bristol Bay District Legislators.

We found in our order of June 6, 1974 that District No. 16 exceeded constitutionally permissible population variances as delineated by decisions of the United States Supreme Court, and that the state had failed to demonstrate that the variance was based on ligitimate considerations incident to the implementation or rational state poli-

---

1. The Anchorage districts were somewhat altered in the revised plan, but appellants' objections again touched general concepts of dividing Anchorage into multiple senatorial districts, and the aggregate underrepresentation of the Anchorage area. No federal constitutional question regarding the propriety of the district lines in Anchorage was raised, and we disposed of the state constitutional

issues in our prior opinion. Appellants' counsel admitted at oral argument that the Anchorage area taken as a whole would be properly represented within federal constitutional standards by a 16-representative, 8-senator district. We need not further consider whether the current plan, which has the same numerical effect, unfairly represents the Anchorage area.

cy. We stated in out opinion partially rejecting the original plan:

> No valid reasons were advanced for the 10.9 percent overrepresentation with reference to House District 16 (Bristol Bay). We can agree with the Board's decision not to combine the Bristol Bay area with the Aleutian Chain because of conflicts between the residents of the two areas, but that does not explain why other areas could not have been added to the district so as to create less of a variance.

The Reapportionment Board has made a good faith effort to correct the overrepresentation of House District No. 16 by adding to the district the southern end of the Kenai Peninsula. Considerations incident to the implementation of rational state policy have now been advanced to us justifying the original overrepresentation of District No. 16 (Bristol Bay). It is now apparent that the only alternative to the Board's original districting of that area is to disregard an impassible mountain range, the natural barrier formed by Cook Inlet, the lack of direct transportation or communication links, the corporate boundaries of the Kenai Peninsula Borough, the cohesiveness of interests of residents of that Borough and the disparate interests of the population of the Bristol Bay area. We now find that legitimate considerations incident to the implementation of rational state policy justify the overrepresentation of House District No. 16 (Bristol Bay) as originally designated and override mathematical requirements.[2] We accordingly have ordered that the severed portion of the Kenai Peninsula Borough, specifically the southern end thereof where the communities of Seldovia, Port Graham, English Bay, Portlock and Jakalof Bay are located, shall remain in House District No.

13 (Kenai-Cook Inlet) rather than in House District No. 16 (Bristol Bay).

We realize that reasonable arguments can be advanced to show that certain communities might be better represented by different districting. Our previous opinion in this case points out that it is not our function to develop apportionment schemes for the State of Alaska. We are limited in review to determining whether a plan adopted by the governor suffers state or federal constitutional defects alleged by the parties in the litigation before us. In our previous opinion we found no violation of those standards set forth in Art. VI of the Alaska Constitution which have not been made obsolete by decisions of the United States Supreme Court. Particularly where specific objections have not been presented to us, we do not believe it appropriate to substitute out judgment for that of the constitutionally empowered authority regarding the wisdom of delicate adjustments to be made in political boundaries. It is our duty to assure that the reapportionment plan complies with the requirement of substantial mathematical equality established by the United States Supreme Court, with the state carrying the burden to demonstrate that additional deviations are based upon legitimate considerations incident to implementation of a rational state policy. Where that burden was not met, we were compelled to require revision of the plan to conform to what has been described as "the tyranny of numbers". The Board having complied with out request, we accordingly have denied the objections to the revised plan, except where the revision demonstrated to us that the original district was properly formed in implementation of a rational state policy.

ERWIN, J., dissents.

---

2. Under the revised plan as amended by our order, the Bristol Bay district is slightly smaller than in the original plan, due to the Board's inclusion of Eek in the revised House District No. 17 (Bethel) where it more properly belongs. Granting the Kenai Peninsula Borough's objection reverses our prior order; in effect, it grants a rehearing based upon newly-discovered evidence, the evidence being the lack of reasonable alternatives to the initial plan. In granting the objection, we do not suggest that we will engage in wholesale redrafting upon request.

FITZGERALD, J., concurs in part and dissents in part.

ERWIN, Justice (dissenting).

While 1 agree that the revised reapportionment plan meets federal constitutional standards, I am unable to agree with the majority's conclusion that it meets the requirements of Alaska's Constitution. In my opinion, the revised plan includes districts which do not comply with the mandate of article VI, section 6, of the Alaska Constitution.

Whatever the merits of the retreat from precise mathematical equality evident in recent reapportionment decisions of the United States Supreme Court, we should not lose sight of the fundamental principle involved in reapportionment—truly representative government where the interests of the people are reflected in their elected legislators. Inherent in the concept of geographical legislative districts is a recognition that areas of a state differ economically, socially and culturally and that a truly representative government exists only when those areas of the state which share significant common interests are able to elect legislators representing those interests. Thus, the goal of reapportionment should not only be to achieve numerical equality but also to assure representation of those areas of the state having common interests.

If we were constrained solely by numbers, Alaska could obviously be divided into any given number of equally populated districts without regard to other considerations. Such a result would satisfy all federal constitutional requirements but would hardly be consistent with traditional notions of representative government, for it would inevitably lead to absurd combinations of historical, social, economic and geographical boundaries within the state. Fortunately, Alaska's Constitution commands that:[1]

Each new district so created shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.[1] Thus, it only is within this framework that equally populated election districts may be constructed. If the search for equal representation is not undertaken within the limits of this constraint, then the underlying rationale for geographical election districts is destroyed.

In my view, the revised plan includes a number of house districts with respect to which the command of article VI, section 6, of the Alaska Constitution was sacrificed in the interest of numerical equality. For example, Fort Greely was included within the Fairbanks District, although it lies over 100 road miles from metropolitan Fairbanks and is located outside of the North Star Borough. Even more objectionable, however, is the fact that Big Delta and Delta Junction, which are five and ten miles respectively closer to Fairbanks along the only highway linking the two areas, were excluded. Many of the dependents of Fort Greely military personnel live, work, and attend school in these communities. If the Big Delta-Delta Junction-Fort Greely community is not a "relatively integrated socio-economic area," it is hard to imagine what is.

There is a similar problem with the addition to the Nome district of the communities of Selawik and Kiana, which are both located near Kotzebue. It is abundantly clear that the Board took this action solely to achieve equality of numbers,[2] for there are no ethnic or commercial ties between these communities and the Nome area and they are separated from Nome by mountains and Kotzebue Sound. In addition, both communities have transportation, economic, and ethnic ties with Kotzebue, not Nome; and, while Kotzebue is part of the same native corporation, Nome is not. In view of all these factors—which lie at the

---

1. Alaska Const. art. VI, § 6.

2. The state conceded at oral argument that all the changes made in the revised plan were made solely to meet numerical requirements of the United States Constitution.

very heart of the concept of socio-economic integration—I fail to discern how such a combination could possibly satisfy article VI, section 6, of the Alaska Constitution.[3]

Yet another example of this failure to comply with the mandate of the Alaska Constitution lies in the Anchorage area. The Anchorage-West district comprising portions of the downtown area, Inlet View, the South Addition, Turnagain, International Airport, Sand Lake, and Jewell Lake, includes a diversity of area residents which range from the most urban in Anchorage to the most rural.[4] Further, the district includes no less than four separate service areas—the City of Anchorage, the Spenard Public Utility District, the Sand Lake Service Area, and the Greater Anchorage Area Borough. In my mind, such a district, which includes as many diverse elements as could conceivably be combined within the Anchorage area, is not a "relatively integrated socio-economic area."

These major miscombinations, along with the short-lived Seldovia-Bristol Bay marriage disapproved by the majority, demonstrate the real tyranny of numbers, for they are products of an effort to achieve mathematical equality by shifting about population centers without regard to socio-economic considerations. By making small numerical adjustments to satisfy federal constitutional standards, the board dismembered important socio-economic communities in violation of Alaska constitutional standards.

In my view, major readjustments on a statewide basis are required if the plan is to meet minumum state and federal constitutional standards. The revised plan demonstrates all too clearly that such adjustments cannot be made in a matter of days under pressure of preparations for an imminent election, for a hastily conceived change correcting a minor deficiency in one district often causes major deficiencies in other districts. As a result, rather than improving the plan, such changes only serve to make it less likely to assure truly representative government.

I sympathize with the majority's desire to end this court's unsatisfactory and controversal intrusions into the political thicket of reapportionment. However, regardless of how reluctant we may be to confront this problem, it nevertheless remains our constitutional duty to the people of Alaska to assure a truly representative government. In my opinion, this goal cannot be achieved by making minor adjustments in the present plan. Because the interim plan had far smaller variances in population and unquestionably respected geographical and socio-economic considerations, I would have continued it in effect for the 1974 elections and remanded the revised plan back to the Board to comply with the mandate of the Alaska Constitution. It is better to err on the side of caution than to perpetuate mistakes for the balance of this decade.

FITZGERALD, Justice (concurring in part and dissenting in part). I would accept the governor's revised apportionment plan as submitted. I disagree with the majority that the southern end of the Kenai Peninsula should be separated from proposed House District 16 (Bristol Bay) and incorporated in House District 13 (Kenai-Cook Inlet). My disagreement with the majority is based on the procedural aspects of the Kenai separation issue.

Kenai Peninsula Borough was not a party to the reapportionment action, nor have we decided its standing to become a party. The Borough appeared before this court

3. Separation by mountains and an expanse of water, lack of direct transportation and communication links, and borough boundaries were all factors which the majority cited as justifying severance of the Seldovia area from the Bristol Bay district. I cannot understand why the presence of the same factors dividing the Selawik-Kiana area from the Nome area does not compel a similar conclusion.

4. The board made a point of its desire to avoid diluting the rural vote with the urban vote in the Fairbanks area. No rational reason has been shown for not following a similar course of action in the Anchorage area.

only amicus curiae. The court accepted the Borough's memorandum two days before final argument without providing an opportunity for the litigants to respond. Moreover, the Borough was then given leave to appear before the court at oral argument. As the majority opinion states, reasonable arguments could be advanced on behalf of other communities that different districting would better represent their interests.[1] To accede to the Kenai Borough's objections to the proposed plan may lead to questions of the right for other communities to raise similar arguments. In light of these circumstances I would accept the governor's revised reapportionment plan without the southern Kenai exclusion despite any reservations I may have about the merits of the particular district boundaries.

1. Supra, p. 5.