510 P.2d 394

The MAYOR AND COUNCIL OF the CITY
OF TUCSON, as elective officers of the
City of Tucson, Appellants,

v.

Robert ROYAL, a qualified elector of Old
Ward #6 of the City of Tucson, and a rep-
resentative of all qualified electors of Old
Wards #3, #5 and #6 who reside in an
area of the city not within the boundaries
of New Wards #3, #5 and #6, Ruddell
Byrd, Morris W. Farr, Michael J. Prost,
Ruth Stokes and Julie Szekely, individual-
ly and on behalf of all others similarly sit-
uated, Appellees.

No. 2 CA–CIV 1431.

Court of Appeals of Arizona,
Division 2.

May 31, 1973.

As Modified June 7, 1973.

Herbert E. Williams, City Atty. by Har-
rison G. Dickey, Sp. Counsel for the City
of Tucson, Tucson, for appellants.

Risner, Wolf & Raven by Mark B. Ra-
ven, Royal & Murray by Robert A. Royal,
Tucson, for appellees.

HOWARD, Judge.

On December 11, 1972, the Mayor and
Council of the City of Tucson pursuant to
Chapter 16, Sec. 8,[1] of the Charter of the
City of Tucson, redistricted the City of
Tucson by duly passing and adopting Ordi-
nance No. 3959 which set forth new ward
boundaries for the six city councilmanic
wards. The redistricting equalized the

---

1. "Sec. 8. City to be divided into wards;
redistricting.

After the general election in Decem-
ber, 1929, and prior to the holding of
any subsequent city election, as herein
provided for, the mayor and council
shall divide the city into six wards,
each ward containing, as nearly as pos-
sible, the same number of registered
voters, based on the registration of

1928. Beginning with the year 1932,
and quadrennially thereafter, the mayor
and council may, if necessary to
equalize the number of registered voters
contained in the said wards, one with
another, re-district the said city as to
the said wards, and said re-districting
shall be done between the first day of
October and the thirty-first day of
December of said years."

population on a ward basis for the forthcoming elections. Of the six city councilmanic wards, Wards 3, 5 and 6 have ward primary and at-large general elections in 1973. Wards 1, 2 and 4 have ward primary and at-large general elections in 1975. Under the Charter of the City of Tucson, Chapter 16, Sec. 9, councilmen are nominated from and by the respective voters of the wards in which they reside and elected by the voters of the city at large. Under Chapter 16, Sec. 4 of the Charter of the City of Tucson, the terms of the councilmen are staggered. It provides that:

". . . (a) in 1961 there shall be elected a mayor and three councilmen for a term of two years, which term shall expire at ten o'clock a. m. on the first Monday in December, 1963; (b) in 1962 there shall be elected three councilmen for a term of three years, which term shall expire at ten o'clock a. m. on the first Monday in December, 1965; (c) in the year 1963 when the said terms provided in (a) hereof shall expire there shall be held elections under the provisions of this chapter at which there shall be elected a mayor and three councilmen to fill the offices expiring on the first Monday in December, 1963; and (d) in the year 1965 when the said terms provided in (b) hereof shall expire there shall be elected three councilmen to fill the offices expiring on the first Monday in December, 1965. Thereafter there shall be held primary and general elections quadrennially for such offices."

Appellees, residents and a prospective candidate of the wards affected, brought two separate actions for declaratory judgment against the City of Tucson to test the constitutionality of the redistricting. The two lawsuits were consolidated and a trial was held January 26, 1973 resulting in a judgment declaring Ordinance No. 3959 unconstitutional.

Since nominating petitions must be filed with the city clerk by July 20, 1973, we accelerated the appeal in order to expedite the decision in this case.

The undisputed evidence at trial was that the City's redistricting Ordinance shifted approximately 46,500 individuals [2] to new wards thus causing them to lose their right to vote in the 1973 City primary election. Appellees presented a plan which also achieved equality in ward population but only caused approximately 8,500 voters to lose their right to vote in the 1973 primary election by shifting them into new wards.

Admitted into evidence was a memo addressed to the Mayor and Council from the City Clerk stating that the following factors were taken into consideration in the new redistricting: (2) one man-one vote using the 1970 census; (b) current residence of each councilman; (c) duly constituted voting precinct boundaries by resolution of the Board of Supervisors, Pima County, April, 1972 (several of these new voting precincts were partially located in more than one city ward), (d) extension of wards to compensate for annexation since December 1968, and (e) possible retention of a southside, northside, westside, and eastside identity.

Examination of the ward map under the new City redistribution shows that the most drastic changes occurred in Wards 1, 5 and 6 with the bulk of the persons losing their primary vote from what were formerly Wards 3 and 6. Several reasons were advanced at trial as justification for the manner in which the new ward boundaries were drawn. Mr. DeLong, mayoral assistant for inter-governmental affairs, testified that there was an attempt to consolidate the "socio-economic factors" of the various wards. When questioned as to what he meant by "socio-economic factors", he stated, "Well, that certain groups within our community reside in certain areas, and wherever possible it might be best to try to have the representation from that ward representing one group." In re-

2. This is approximately 38% of the persons who were entitled to vote prior to the new Ordinance.

sponse to a request for some examples, he stated "Well, I think it is pretty commonly understood that we have a very large Mexican-American community on the south and to some extent on the west side of the City, and as we go the east side of the City, the economic factors improve."

Councilman Emmett McLoughlin, who took part in the preparation of the new Ordinance testified that they started by dividing the population of the City by six, the number of wards, and attempted to develop the ward population as close and as proximate as possible. When asked about the change in Ward 5 which under the new plan includes a large part of what was formerly Ward 1, he stated:

\* \* \* \* \* \*

"We were particularly interested in ward five because Councilman Castillo had gone through some embarrassment in the last couple of years in that his southside ward office, while he is the councilman for ward five, happens to be in ward one, or happened to be in ward one, and I know that there were some immediate comments about this particular fact. With that in mind, and the fact that this part of the City tended to be Mexcian-American and was represented dually [3] and there seemed to be no real logical reason why one and five should be separated like so, we said, let's start with ward five, and took a population tally from the different precincts in the southside of town and moved up. . . ."

In referring to Ward 3, Councilman McLoughlin stated that the Ward 3 tended to be ". . . a distinct socio-economic group, to my knowledge." Again referring to Ward 3, he spoke of the neighborhood concept, which prompted them to place the Flowing Wells and Amphitheater areas of Tucson in Ward 3 instead of Ward 1. Also, in consideration of the "neighborhood plan", he stated that four of the City Councilmen had established advisory boards consisting of citizens who met with the Councilmen in representing their ward. He mentioned that an additional consideration was the fact that the eastside of town was growing rapidly and had different problems from other areas of town. Councilman McLoughlin further testified:

\* \* \* \* \* \*

". . . We were thinking of an east side City Hall, a south side City Hall. We were thinking of advisory boards. And the problems that we have there in working with the people, because there are people—I might point out, if I may, Your Honor, the question arises what good does it do to have city wards anyway, with the exception of the nominating process which gives us a geographical basis.

The only other real effect that a ward boundary would have is that frequently someone with a problem or complaint will call into our office and say, I would like to talk to my Councilman. The secretary in our office will then confer with the ward map and say, your councilman is, this is your phone number. Thus, you could have some people who, many of them Mexican-Americans, who live—this part of town, off of Irvington Road, who had a Councilman who lived about a mile away from where they did who really understood the problems of the southside. Yet their Councilman lived seven or eight miles away, which is not to knock the fact that Councilman Romero lives seven or eight miles away.

We think from the point of view of providing better understanding, feeling, with the public, because the councilman hood or a southern tier district represented by councilman Castillo can better perform a service of just communicating with the public, because the councilman knows more about his specific area than someone else who lives seven miles away.

I submit that looking at ward one as an example, it is probably ten miles long,

3. Ward 1 is represented by Ruben Romero.

it goes from various soci-economic groups and something that could be better contained and made more continuous, and that is a consideration we did take into effect."

\*     \*     \*     \*     \*     \*

After presentation of all the evidence and submission of written memoranda by the parties the trial court made findings of fact and conclusions of law. The court's findings of fact are reflected in our general discussion of the facts and the conclusions of law were:

"1. Both the City's plan and the Plaintiffs' plan meet the constitutional requirement of parity of population among wards.

2. Re-districting of the wards can be accomplished to meet population requirements with a shift of approximately ⅕ of the number of persons shifted under the City's plan.

3. Infringement of voter's rights under the City's plan is grossly in excess of what would be warranted in order to meet the constitutional requirement of parity of population.

4. Such infringement is illegal in the absence of compelling governmental interest.

5. No evidence was presented by defendants showing such a compelling governmental interest.

6. The City's plan is an unconstitutional infringement upon plaintiffs' voting franchise and a violation of their rights under the Equal Protection Clause of the Constitution of the United States.

7. The defendants' adoption of said plan was arbitrary and an abuse of discretion."

The court then ordered appellants to present to the court within fourteen days a ward redistricting plan which would provide for wards with approximately equal population but with adjusted population no larger than that contained in the appellees' plan. The court further ordered that in the event appellants did not comply, the court would then direct the City to adopt the appellees' plan as presented.

Appellants present the following question for review:

"In redistricting to achieve population parity for staggered ward primary elections, does deferment of voting rights in excess of what would be warranted to get population parity violate the equal protection clause of the Federal Constitution unless Appellant shows a compelling state interest?"

The thrust of appellants' argument is that all they need show is that the one-man, one-vote principle was satisfied. This contention is somewhat diluted by their apparent recognition in their brief that the drawing of the boundaries must be on a rational basis and cannot result in invidious discrimination. Appellants strongly rely on the case of Griswold v. County of San Diego, a recent decision of the Court of Appeal, Fourth Appellate District, Division One, State of California, 107 Cal.Rptr. 845 (1973).

Although appellants do not argue in their brief that any rational bases or compelling state interest need be found, they state: "The rational bases, or compelling state interest, if one need be found, is the system itself, and the finding that the one-man, one-vote principle was adhered to." In any event, they assert that the additional rational basis is found in the criteria set forth in the memo to the Mayor and Council and in the testimony of Councilman McLoughlin as to socio-economic and neighborhood considerations.

■ The appellees, on the other hand, contend that when there is a delay in the voting privileges for a large segment of the population as is the case here,[4] the City

4. Those persons in the new wards would not be able to vote in a primary election until 1975. The last primary election they voted in was in 1969. Thus they would be deprived of participation in the primary process for a six-year period.

cannot justify the result by merely showing achievement of population parity in the wards. Rather, appellees assert, appellants must demonstrate a compelling state interest and that a less drastic means of serving that interest is not available. We agree with appellees' position and hold that the trial court's conclusions of law and judgment were eminently correct.

The germinal case of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) first established that in order to fully implement the constitutional right to vote, the vote of all citizens should have approximately equal weight. The constitution was held to require equality of population among various federal electoral districts. In Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) this principle was held to apply to local governments as well.[5] Equal protection principles apply to primary elections to the same extent as to any other elections. *See,* United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), which held that the right to vote for Congressional candidates in the Louisiana primary election was "secured by the Constitution." This case recognized the importance of the primary stage in the electoral process:

"[W]e cannot close our eyes to the fact already mentioned that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice of the general election. . . ." 313 U.S. at 319, 61 S.Ct. at 1039.

In Smith v. Allright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the court held that primaries are an integral part of the election process, that parties which conduct themselves pursuant to state law are acting as agents of the state, and that primaries are thus subject to constitutional requirements.

Contrary to the thrust of appellants' argument, it is firmly established that there are additional criteria operative in redistricting even after the requirement of one-man, one-vote has been satisfied. Such additional criteria are set forth in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) wherein the court stated that an apportionment scheme cannot operate to minimize or cancel out the voting strength or political elements of the voting population.

It is without cavil that the right to vote is a constitutionally protected right and legislative interference with this right is not justified by merely showing a substantial state interest.

Laws which impair the right to vote are unconstitutional unless the governmental body can demonstrate that the laws are *necessary* to promote a *compelling* governmental interest. In Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed. 2d 274 (1972), the court explains the test:

". . . Thus phrased, the constitutional question may sound like a mathematical formula. But legal 'tests' do not have the precision of mathematical formulas. The key words emphasize a matter of degree: that a heavy burden of justification is on the State, and that the statute will be closely scrutinized in light of its asserted purposes.

It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means which unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' [citations omitted], and must be 'tailored' to serve their legitimate objectives. [citation omitted]. And if there are other, reasonable ways to achieve those goals with a lesser bur-

5. In the case of state and local apportionment a more flexible standard than "absolute equality" is applied. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967).

den on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' [citation omitted]." 92 S.Ct. at 1003.

We do not agree with appellants that since population parity within the wards is required, any means which achieves such parity will suffice even though the temporary disenfranchisement of a large segment of the population, and more than is necessary, results.

We recognize that the problem of apportionment can be difficult for a legislative body, to say the least. The task is complicated when such body is faced with the unique type of staggered elections which we have in the City of Tucson. The only other case we have been able to find which deals with a similar situation is Griswold v. County of San Diego, supra. In Griswold, the board of supervisors of San Diego County adopted an ordinance which distributed the population of San Diego County among five supervisorial districts. Opponents to the redistricting offered a plan which deferred the right to vote of only 18,000 as opposed to 40,000 voters. The California appellate court stated that a minimum change requirement would unduly restrict a legislative prerogative, presupposed that existing district alignments best served the interest of the area, inhibited change, and de-emphasized the statutorily imposed considerations to be given in such matters, namely topography, geography, cohesiveness, contiguity, integrity, compactness of territory and community of interest. In sustaining the action of the board of supervisors, the court pointed out:

". . . Besides accomplishing equality of population among the districts, the plan adopted had among its purposes:

(1) Uniting the City of El Cajon, the City of La Mesa, Lomon Grove, Spring Valley, Santee and Lakeside communities (the heartland area) into one district. These areas, all in the east county and geographically related, had previously been in three separate supervisorial districts.

(2) Uniting the Linda Vista area of San Diego into the same district and thus discontinuing the fragmentation of a minority community.

(3) Uniting the South Bay Cities of Chula Vista and National City into the same district. These neighboring cities had been previously divided into two districts, a subject of substantial community complaint."

The evidence in the Griswold case discloses that the board of supervisors had studied the matter of reapportioning the county for six months after the 1970 census figures became available, conducted lengthy hearings and considered different plans.

We find the rationale of the Griswold case inapposite, since the factual posture differs from the case sub judice. We can well see and appreciate the substantial interest in maintaining the integrity of local government units thereby giving such units the opportunity to champion local legislation. Mindful of the fact that the test to be applied is not a precise mathematical formula and emphasizes a matter of degree, it may well be that the board of supervisors in Griswold satisfied the constitutional requirements set forth in Dunn v. Blumstein, supra. When, however, we apply the test to the facts of the instant case we are confronted with a dearth of evidence to support the conclusory assertions used to justify the results. What is meant by "socio-economic" makeup? What is meant by "neighborhood"? Are there clearly defined neighborhoods in the areas involved? What was the "socio-economic" makeup of the wards before and after the new ordinance? What was the "neighborhood" makeup of the wards before and after the ordinance? Was Ward 1 not being adequately represented because its Councilman lived seven or eight miles away from the so-called center of his constituency?

All of these questions were left unanswered. Furthermore, there was no evidence that the criteria listed in the memo-

randum to the Mayor and Council could not be substantially satisfied by adopting appellees' plan.

We do not believe that appellants demonstrated that the Ordinance was necessary to promote a compelling state interest in the face of the temporary disenfranchisement of 38,000 voters and an apparent less disruptive alternative.

Affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.