Rick KENTOPP, a named representative of the class of residents, taxpayers and registered voters in Section Six of the Municipality of Anchorage, Appellants,

v.

ANCHORAGE, a municipal corporation, Jane Angvik, David Rose, Gerry O'Conner, Rick Mystrom, Bernard Marsh, Paul Baer, Lydia Selkregg, Don Smith, Fred Chiei, Jr., Carol Maser, David Walsh and Joseph Josephson, Appellees.

No. 6209.

Supreme Court of Alaska.

Oct. 1, 1982.

George E. Weiss, George E. Weiss & Associates, Anchorage, for appellants.

Julie Garfield, Asst. Municipal Atty., Jerry Wertzbaugher, Deputy Municipal Atty., Theodore D. Berns, Municipal Atty., Anchorage, for appellees.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

Rick Kentopp appeals from summary judgment in favor of the Municipality of Anchorage. The legal issues we must resolve relate to the apportionment of Anchorage Municipal Assembly districts.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In 1975, Anchorage adopted an apportionment plan for its Assembly. Under the plan, the Assembly was comprised of eleven members representing six districts. District 2 had one representative and all the other districts had two.

On September 10, 1979, the Anchorage Planning Department sent the Municipal Clerk the 1979 population estimates for each Municipal Assembly district. The estimates indicated the following gross differences in population/Assembly member between the Assembly districts:

| District | Number of Assembly Members | Total Population | Population/ Assembly Member |
|---|---|---|---|
| 1 | 2 | 33,854 | 16,927 |
| 2 | 1 | 28,386 | 28,386 |
| 3 | 2 | 21,430 | 10,715 |
| 4 | 2 | 29,121 | 14,561 |
| 5 | 2 | 37,629 | 18,815 |
| 6 | 2 | 53,227 | 26,614 |

The Department made its estimates by counting all the housing units in the city, and by estimating the average number of people per housing unit and the vacancy rate of housing units.

Anchorage Home Rule Charter section 4.01[1] provides in part:

> The Assembly shall be reapportioned whenever it becomes malapportioned. The Assembly shall determine and declare by resolution whether or not it is malapportioned within 30 days from: (1) receipt of the final report of each federal decennial census, including any supplementary data necessary to establish population distribution within the municipality; (2) receipt of a petition of 50 or more qualified voters alleging and containing reliable evidence that the Assembly is malapportioned.
>
> If the Assembly determines that it is malapportioned, it shall, within five months of the determination, reapportion itself in the manner provided by law.[2]

Pursuant to Charter section 4.01(2), a petition claiming the Assembly was malapportioned, signed by over fifty qualified voters, was submitted to the Anchorage Municipal Clerk on October 1, 1979. The petition referred to the Planning Department figures.

On December 11, 1979, the Assembly discussed whether the Planning Department estimates provided reliable evidence that the Assembly was malapportioned. After discussing the issue, the Assembly, by a 7–2 vote, defeated a resolution declaring itself malapportioned.

The Assembly continued to discuss the apportionment question throughout 1980, but did not reverse its December 1979 decision not to declare itself malapportioned. The Assembly recognized that Charter section 4.01 provided that once it declared itself malapportioned, it would have to reapportion within five months. The Assembly, however, believed that although the Planning Department estimates showed there was malapportionment, the decennial census figures would more accurately show the precise degree of malapportionment. The Assembly further believed that if it reapportioned on the basis of the Planning Department figures, it would have to reapportion again when the more accurate figures were released. The Assembly therefore did not want to reapportion before the final decennial census figures were released in the spring of 1981.

Thus, the September 25, 1979, Assembly minutes paraphrase Assembly member David Walsh as stating that if the Assembly were "going to reapportion, then it has to be on the best figures." At the December 11, 1979, Assembly meeting, Michael Meehan, Director of the Planning Department, told the Assembly that the final census figures would be more accurate than the Planning Department estimates. The December 11, 1979, minutes summarize the comments of Assembly members David Marsh, Rick Mystrom, and Paul Baer:

1. Charter § 4.01 is codified in the Anchorage Municipal Code [hereinafter AMC] at § 2.20.-010.

2. Though not applicable to a home rule municipality pursuant to AS 29.13.100, the Legislature has mandated a similar reapportionment scheme for borough assemblies. AS 29.23.025 provides in pertinent part:

   (a) Not later than two months after the official report of a federal decennial census, the borough assembly shall determine and declare by resolution whether the existing apportionment of the borough assembly meets the standards of AS 29.23.021....

   . . . .

   (c) If a petition signed by not less than 50 registered voters who are residents of the borough requests the borough assembly to determine whether the existing apportionment meets the standards for apportionment in AS 29.23.021, and the petition contains evidence that the existing apportionment does not meet those standards, the assembly may make the determination requested. The borough assembly shall make a determination required by this subsection within two months of receipt of a petition which meets the requirements of this subsection.

   . . . .

   (e) Within six months of a determination by the borough assembly under (b) or (c) of this section that the current apportionment does not meet the standards of AS 29.23.021, the borough assembly shall adopt an ordinance providing for reapportionment, and submit the ordinance to the voters.

Mr. Marsh stated ... [i]f they declare themselves malapportioned tonight the election must be held in May, before the census data is available to them. He [Marsh] requested advice on how the Assembly can move so that the time schedule comes out correctly.

. . . .

Mr. Mystrom stated that ... [h]e would support waiting for census data.

. . . .

Mr. Baer suggested ... [u]ntil the census figures become available, composition of the Assembly should remain as it is. If the Assembly declares itself malapportioned, then they must abide by the Charter [*i.e.* reapportion within five months].

In the winter of 1980, the Assembly appointed a Municipal Reapportionment Committee to review the apportionment question. The Committee, which did not include any Assembly members, submitted a written report to the Assembly on July 29, 1980, which stated in part:

The U.S. Census was conducted earlier this year, but the final official report will not be available until the Census is released on April 1, 1981. . . . [I]nasmuch as the full report of the U.S. Census will be available in a reasonably short time, we recommend that the Municipal Assembly await this report before reapportionment is implemented.

The August 19, 1980, minutes summarize the comments of Assembly member Gerry O'Connor: "He further stated the Assembly kept putting it off because everyone knew if you reapportioned too early, then you would run the risk of being off and would have to go back and redo it. He felt the Assembly must wait until the census fig-

ures were in." The September 23, 1980, minutes paraphrase Assembly member Don Smith as saying: "If we take this step now and base our reapportionment on the figures of the Planning Department, the Assembly may have to reapportion immediately when the Federal census figures are approved."

On August 28, 1980, Rick Kentopp, a resident of Anchorage, filed suit against the Municipality of Anchorage and all the Assembly members. Kentopp essentially alleged that the Assembly violated Charter section 4.01 when it voted on December 11, 1979, against the resolution declaring itself malapportioned. Kentopp requested the court to order the Assembly to reapportion all the districts and to truncate the terms of the Assembly members by holding an election for all Assembly seats from the new districts before October 1981.

Subsequent to the filing of the lawsuit, the Assembly on January 6, 1981, passed a resolution stating that it would reapportion within five months of the date that the final 1980 decennial United States census figures became available. On January 13, 1981, the Assembly declared itself malapportioned.

Final census figures were issued for Anchorage on some date between April 14, 1981, and May 26, 1981. Although both the decennial census figures and the Planning Department figures indicated malapportionment among the six Assembly districts, the two data bases differed substantially. The following chart compares the decennial census figures with the Planning Department estimates for each Assembly district prior to reapportionment:

| District | Number of Assembly Members | Planning Dep't | Census |
|---|---|---|---|
| 1 | 2 | 33,854 | 20,873 |
| 2 | 1 | 28,386 | 17,859 |
| 3 | 2 | 21,430 | 20,427 |
| 4 | 2 | 29,121 | 23,939 |
| 5 | 2 | 37,629 | 31,094 |
| 6 | 2 | 53,227 | 45,859 |

Prior to the May 26, 1981, Assembly meeting, the public received proper notice that the Assembly would discuss at that meeting Anchorage Ordinance [hereinafter AO] 81–76, a proposal to reapportion the Assembly. At the meeting, the Assembly approved AO 81–76.

The AO 81–76 reapportionment plan redrew the boundaries of all six districts. Under the new boundaries, the five districts with two Assembly members had approximately but not precisely equal populations. The single district with one Assembly member had almost one-half the population of the districts with two members.

The Assembly members' terms were not scheduled to expire until 1982 or 1983. At the May 26, 1981, meeting, the Assembly members voted down an amendment to AO 81–76 that would have truncated their terms by requiring an election for all eleven Assembly seats in October 1981. The public had not received notice prior to the meeting that the Assembly members would discuss truncation of their terms.

Meanwhile, Kentopp had filed for summary judgment on March 25, 1981. After Anchorage reapportioned its districts on May 26, 1981, it filed a cross-motion for summary judgment. In the memoranda submitted in support of the motion for summary judgment, Kentopp addressed both the truncation and Charter section 4.01 issues raised in his complaint. Kentopp abandoned the request he had made in his complaint that the court order the Assembly to reapportion, apparently because the Assembly had declared itself malapportioned in the interim.

The superior court granted summary judgment to Anchorage on all issues the parties had raised. The superior court, *sua sponte,* also granted summary judgment to Anchorage on the issue of whether there was malapportionment under the reapportionment plan Anchorage had adopted on May 26, 1981. The superior court held that there was no malapportionment.

Kentopp appeals from these decisions. In addition to the arguments raised below, Kentopp argues that the superior court's *sua sponte* determination that there is no malapportionment under the reapportionment plan adopted on May 26, 1981 was improper. For the reasons set forth below, we conclude that the superior court properly resolved the Charter section 4.01 and truncation issues, but erred in deciding *sua sponte* the question of malapportionment under the new plan.

## II. COMPLIANCE WITH CHARTER SECTION 4.01

We first address whether Anchorage's declaration that it was malapportioned in January 1981, and its subsequent adoption of a reapportionment plan, renders moot the question of whether the Assembly's failure to declare itself malapportioned in December 1979 constituted a violation of Charter section 4.01.

In a long line of cases, we have recognized that certain disputes, though arguably moot in a technical sense, merit review under the "public interest" exception to the mootness doctrine.[3] We reiterated in *Thomas v. Rosen,* 569 P.2d 793 (Alaska

---

**3.** Various technically moot issues have fallen within the public interest exception: *e.g., State v. Thompson,* 612 P.2d 1015, 1016 (Alaska 1980) (whether hearing is needed before administrative agency can order out-of-state witness to appear for deposition); *Alaska Transp. Comm'n v. Gandia,* 602 P.2d 402, 403 (Alaska 1979) (legality of hearing procedures used by the Alaska Transportation Commission); *Thomas v. Rosen,* 569 P.2d 793, 794–95 (Alaska 1977) (whether constitution empowers Governor to use item veto to amend bond authorization); *Wagstaff v. Superior Court,* 535 P.2d 1220, 1226 (Alaska 1975) (whether juvenile has a right to select counsel of her choice or whether she has to take counsel her parents selected for her); *Etheredge v. Bradley,* 502 P.2d 146, 153 (Alaska 1972) (whether summary prejudgment attachment of property is constitutional); *Johansen v. State,* 491 P.2d 759, 761–62 (Alaska 1971) (whether persons can be jailed for failing to pay child support); *Doe v. State,* 487 P.2d 47, 53 (Alaska 1971) (whether one-day's notice to juvenile is constitutionally adequate in delinquency proceeding); *R.L.R. v. State,* 487 P.2d 27, 45 (Alaska 1971) (whether juvenile's sentence was overbroad); *In re G.M.B.,* 483 P.2d 1006, 1008 (Alaska 1971) (whether detaining juvenile between his adjudicative and dispositive hearings is legal).

1977), the guidelines used to ascertain whether a question normally considered moot nonetheless merits adjudication:

"To invoke the [public interest] exception, a two pronged test must be met: The dispute must be a recurring one, and its nature must be such that the mootness doctrine, if applied, would effectively [preclude review of the issue]."

569 P.2d at 795, *quoting In re G.M.B.,* 483 P.2d 1006, 1008 (Alaska 1971).

■ We conclude that the immediate question, even if technically moot, falls within the public interest exception. Charter section 4.01 defines both the reapportionment responsibilities. of the Anchorage Assembly as well as the parameters of the reapportionment petition process.[4] That this important question of the proper construction of Charter section 4.01 may recur is apparent from the fact that the eleven Assembly districts are expected to continue to grow at varying rates. Moreover, a belated declaration of malapportionment can always be said to render a prior failure to declare malapportionment moot. We thus think it plain that, absent adjudication in the present case, this important and recurring issue will likely evade review.

■ We now turn our attention to whether Anchorage improperly failed to issue a declaration of malapportionment in December 1979. The constitutional requirement of reapportionment[5] is satisfied by reapportionment based upon a decennial census, which procedure is set forth in Charter section 4.01(1). In addressing the reapportionment of the state legislature, we recognized in *Groh v. Egan,* 526 P.2d 863 (Alaska 1974), that "it has never been held that the due process or equal protection clauses of the United States or Alaska Constitutions dictate reapportionment upon some population base other than that of

decennial census." 526 P.2d at 868 (footnote omitted). We then quoted with approval the following passage from *Reynolds v. Sims,* 377 U.S. 533, 583, 84 S.Ct. 1362, 1392, 12 L.Ed.2d 506, 540 (1964):

In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation.

526 P.2d at 868. The Assembly's failure to declare itself malapportioned in 1979 thus does not raise constitutional considerations.

Anchorage, however, established a reapportionment schedule more stringent than the constitutionally prescribed minimum. Charter section 4.01 mandates reapportionment not only upon receipt of a decennial census indicating that the Assembly is malapportioned, but upon receipt of a petition signed by fifty voters "containing reliable evidence that the Assembly is malapportioned." The petition at issue in the present case referred to the population data developed by the Municipal Planning Department. Pursuant to Charter section 4.01, the Assembly was therefore obligated to declare itself malapportioned within thirty days if the Planning Department data provided "reliable evidence" of malapportionment.

The Assembly failed to respond to the petition until December 11, 1979, seventy-one days after receipt.[6] Its response on that date—a vote against declaring itself malapportioned—necessarily implied a find-

---

**4.** More generally, we note the similarity of Charter § 4.01 and the obligations imposed by AS 29.23.025(c). *See* note 2 *supra.*

**5.** Alaska Const. art. VI, § 3, states in relevant part, "Reapportionment shall be based upon civilian population within each election district as reported by the census."

**6.** Charter § 4.01 provides that the Assembly must respond within 30 days of receipt of a petition containing reliable evidence of malapportionment. The parties have not argued whether or not the Assembly's response was timely and, accordingly, we will not address this issue.

ing of fact that the Planning Department estimates did not provide reliable evidence that malapportionment existed. Kentopp argues that the petition was supported by reliable evidence of malapportionment and that the Assembly thus violated Charter section 4.01 when it failed to declare itself malapportioned on December 11, 1979.

■ Anchorage submits that its failure to declare itself malapportioned in 1979 was proper because the forthcoming decennial census data would afford a more accurate population survey. The plain wording of the Charter provision, however, requires the Assembly to act upon any properly signed petition supported by reliable evidence of malapportionment. Evidence is not "unreliable" within the meaning of Charter section 4.01 merely because allegedly more accurate or more comprehensive data will be available to the Assembly in the future. Anchorage, in effect, has interpreted the Charter provision to require petitioners to establish that their petition is supported by data at least as reliable as the decennial census. Such a restrictive interpretation imposes an evidentiary burden not suggested by the Charter provision itself. Indeed, because it may always be said that decennial census data is forthcoming, the interpretation advanced by Anchorage would, as a practical matter, render illusory the petition process created by Charter section 4.01(2).

Anchorage's argument that the decennial census data may be more accurate than the Planning Department data thus does not in itself render the Planning Department data "unreliable." We note, in this regard, that the Charter provision invites a distinction between the quality of the evidence necessary to mandate a declaration of malapportionment and the quality of the evidence upon which the reapportionment plan will be based. Once it is established that a petition is supported by reliable evidence of malapportionment, the Assembly must declare itself malapportioned within thirty days. Yet, after such a declaration is made,

the Assembly has five months to enact a reapportionment plan. This five-month period presumably provides sufficient time for the Assembly to obtain whatever additional data may be needed to provide an accurate basis for the reapportionment plan.

■ Anchorage also argues that two factual sources, discussed below, support the Assembly's determination that the Planning Department data was unreliable. Factual determinations made by a municipal legislative body with respect to the local electoral process are, of course, entitled to deference when reviewed by a court. *Cf. Groh v. Egan,* 526 P.2d at 866–67 ("reasonable and not arbitrary" test applicable in review of Governor's reapportionment plan). We nonetheless conclude that the evidence considered by the Assembly in 1979 failed to substantially impugn the reliability of the Planning Department data.[7]

First, a September 10, 1979, memorandum from the Planning Department to the Municipal Clerk indicated that its population estimates did not include the 1,162 Anchorage residents who lived in group quarters or nontraditional housing. This omission, however, constituted only about one-half of one percent of the total estimated Anchorage population and therefore did not significantly undermine the estimates disclosing the existence of malapportionment.

Second, Anchorage refers to the affidavit of Michael Meehan, the Director of the Planning Department, and the deposition of Dr. Richard Ender, the petitioners' demographic expert. The following portion of the minutes of the December 11, 1979, Assembly meeting reflects the concerns drawn from the views of these two experts:

> Discussion ensued on the accuracy of figures presented by Dr. Ender. DR. ENDER [sic] stated his figures were accurate within five percent.
>
> Chairman Walsh asked if he had prepared the numbers contained in the memoran-

---

7. We think it noteworthy that, notwithstanding its claim that the data was unreliable, the Assembly declared itself malapportioned in January 1981, several months prior to receipt of the decennial census figures.

dum or the population profile figures, and he replied he had not, that those numbers had come from the Planning Department. Mr. Meehan, Director of the Planning Department, stated they had only provided numbers and had not considered the political ramifications. They had endeavored to put 100% accurate information in the memorandum. U.S. Census Data, however, is assembled on a 100% sampling of all houses in Anchorage. The Planning Department, on the other hand, used various techniques. Some of the information is based on a 2% sample, and the vacancy rate used information compiled by the Post Office and only included units with addresses.

Assemblyman Chiei stated he had met with the demographic people and was informed they actually had people on the street counting. Mr. Meehan replied they were only in the [Bowl area], and that the Census sample would be more accurate.

Ms. Angvik asked if he would advise the Assembly [to] wait until after the first count of the Census and Mr. Meehan replied the Census would be initiated in April. In June or July the Administration may receive a count on housing units and population. The Planning Department intends to form a special census team to collect data for comparison to the census information and formulate a response within the 10-day period allowed.

The concerns alluded to by the Assembly simply fail to establish that the Planning Department data did not provide reliable evidence of malapportionment. The most relevant concern is Meehan's reference to the limited sample size and to the basis of the vacancy rate information.[8] Even assuming, however, that such factors interject a margin of error, there is no evidence that the substantial comparative variance[9] indicated by the Planning Department data is not reliable evidence of malapportionment. Meehan testified that the Planning Department tried to be 100 percent accurate. Further, a precise estimate of the margin of statistical error was presented by Ender, a

---

**8.** In an affidavit filed on May 8, 1981, Meehan stated that the methodology employed by the Planning Department "is a reasonable method *for annual planning purposes* which require only gross total population estimates when cost and staff restrictions are considered." [Emphasis added.] Meehan then identified the following three sources of error when the data is used for the *purposes of reapportionment:*

A. The 1979 field survey of housing units did not extend to each and every area of Anchorage. The number of housing units in Eagle River, Chugiak and Turnagain Arm areas was derived by use of aerial photographs only. It is likely that significant numbers of housing units were uncounted for this reason.

B. In 1979, vacancy rate data was supplied to Anchorage by the U.S. Post Office which only considered houses with street addresses in the Anchorage Bowl area while excluding Eagle River, Chugiak and Turnagain Arm areas, as well as Bowl houses without street addresses.

C. The Post Office normally conducts its vacancy rate survey on a single day in the year by having persons who deliver mail decide whether or not a unit is occupied based solely on the unit's outward appearance.

**9.** The following table illustrates the comparative variance established by the Planning Department data:

| District | Number of Assembly Members | Total Population | Population Per Assembly Member | % Variance From Mean Population Per Assembly Member of 19,336 |
|---|---|---|---|---|
| 1 | 2 | 33,854 | 16,927 | 12.5% |
| 2 | 1 | 28,386 | 28,386 | −46.8%* |
| 3 | 2 | 21,430 | 10,715 | 44.6% |
| 4 | 2 | 29,121 | 14,561 | 24.7% |
| 5 | 2 | 37,629 | 18,815 | 2.7% |
| 6 | 2 | 53,227 | 26,614 | −37.6%* |

* (−) refers to underrepresented

demographer at the University of Alaska at Anchorage, who told the Assembly that the Planning Department data was accurate within five percent. The Planning Department data indicated malapportionment much greater than five percent. Accordingly, the estimates provided reliable evidence that malapportionment existed, even if the data did not indicate the exact percentage of malapportionment. It is worth reiterating that Charter section 4.01 does not contemplate that "reliable" evidence of malapportionment be so precise that such evidence, without refinement, affords an adequate basis for the actual reapportionment plan.

■ Anchorage does not dispute that the Planning Department data, if reliable, provided evidence of comparative variance that mandated a declaration of malapportionment. Charter section 4.01 does not define "malapportionment." The related statutory enactment, AS 29.23.021(a), provides: "Assembly composition and apportionment shall be consistent with the equal representation standards of the Constitution of the United States." In *Groh v. Egan,* we reviewed the relevant federal authorities and adduced the rule "that in the absence of a showing that the manner of reapportioning a state was improperly motivated or had an impermissible effect, deviations of up to ten percent require no showing of justification." 526 P.2d at 877 (footnote omitted). *See White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). Conversely, maximum comparative variances of over ten percent are unlawful unless the government body justifies the malapportionment. We adopt the preceding definition of "malapportionment" for purposes of construing the Anchorage Municipal Charter. Even accepting a wide margin of error, the Planning Department data evidenced comparative variances far in excess of ten percent.[10] Anchorage offers no compelling rationale to justify the wide degree of variance in Assembly districts. We accordingly conclude

that the Planning Department data provided reliable evidence of malapportionment in December 1979.

We might well question the wisdom of Charter section 4.01(2), as well as related statutory provisions. With hindsight, it is apparent that the Planning Department data, though not shown to be unreliable in 1979, differed substantially from the decennial census data. Any reapportionment plan adopted by the Assembly in response to the 1979 petition would, in all likelihood, have to have been modified once the decennial census data was available. The question, however, of whether the cost and disruption attending reapportionment on more than a decennial basis are offset by more compelling policy concerns is a matter committed to the judgment of legislators and not to the courts. Charter section 4.01 sets forth the Assembly's obligation in unambiguous terms. We conclude that the Assembly failed to comply with Charter section 4.01 by refusing to declare itself malapportioned when presented in October 1979 with a petition supported by reliable evidence of malapportionment.

### III. TRUNCATION

We next address whether the superior court erred in not ordering the premature termination of the incumbant Assembly members' terms of office and an expeditious election of an Assembly body representative of equally apportioned districts.

The reapportionment plan adopted by the Assembly in January 1981 did not modify the staggered terms of the eleven Assembly members. As a result, none of the eleven Assembly seats will be voted upon until the 1982 election, when the terms of five members end. The other six members will be voted upon in the 1983 election. Kentopp argues that the Assembly was required to truncate all Assembly terms because a substantial number of Anchorage voters were shifted into new districts under the reap-

**10.** *Id.*

portionment plan,[11] and were thus denied an opportunity to vote for their newly designated Assembly representative.

■ Truncation may well be an appropriate tool to apply in conjunction with reapportionments. In *Groh v. Egan* we said:

"A need to truncate the terms of incumbents may arise when reapportionment results in a permanent change in district lines which either excludes substantial numbers of constituents previously represented by the incumbent or includes numerous other voters who did not have a voice in the selection of that incumbent. The discretionary authority to require mid-term elections when necessary is well established."

526 P.2d at 881 (footnote omitted), *quoting Egan v. Hammond,* 502 P.2d 856, 873–74 (Alaska 1972). Our affirmance of the Governor's decision to order truncation in both *Groh v. Egan* and *Egan v. Hammond,* however, offers no support for Kentopp's argument that truncation is constitutionally required in the present case. The formulation of a reapportionment plan is a decidedly political process. Though we remain mindful of our obligation to assure compliance with all constitutional guarantees, we will not lightly interfere with the reapportionment process as long as there is " 'a reasonably conceived plan for periodic readjustment of legislative representation.' " *Groh v. Egan,* 526 P.2d at 868, *quoting*

*Reynolds v. Sims,* 377 U.S. at 583, 84 S.Ct. at 1392, 12 L.Ed.2d at 540. We emphasized in *Groh v. Egan* the limited scope of our review of reapportionment plans: "It cannot be said that what we may deem to be an unwise choice of any particular provision of a reapportionment plan from among several reasonable and constitutional alternatives constitutes 'error' which would invoke the jurisdiction of the courts." 526 P.2d at 866. We held that the Governor's formulation of a reapportionment plan for the state legislature will be validated if executed with proper authority and if "reasonable and not arbitrary." *Id.*

■ Deference similar to that owed the Governor in fashioning a state reapportionment plan is due the Anchorage Assembly in its decisions regarding the adoption of a municipal reapportionment plan. Whenever a legislature is composed of members elected in staggered terms, the temporary disenfranchisement of transferred voters is an inevitable consequence of the reapportionment does not constitute invidious discrimination in violation of the constitutional guarantee to equal representation. *Mader v. Crowell,* 498 F.Supp. 226 (M.D.Tenn. 1980), *vacated on other grounds,* 444 U.S. 505, 100 S.Ct. 992, 62 L.Ed.2d 701 (1980); *Ferrell v. Oklahoma ex rel Hall,* 339 F.Supp. 73, 82 (W.D.Okl.1972), *aff'd mem.,* 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972); *Legislature v. Reinecke,* 10 Cal.3d 396, 516 P.2d 6, 12 (1973); *Barrett v. Boyle,*

11. The following table, prepared by Kentopp, summarizes the effect of the reapportionment plan:

(BASED ON APRIL 1980 CENSUS FIGURES)
EFFECT ON THE INDIVIDUAL DISTRICTS

| District Involved | Persons Added | Percent Added of New District Total | Persons Removed | Percent Removed of New District Total |
|---|---|---|---|---|
| 1 | 7,983 | 27.665% | 0 | 0.00% |
| 2 | 0 | 0.000% | 4,580 | 34.49% |
| 3 | 12,665 | 42.215% | 3,091 | 10.30% |
| 4 | 7,608 | 26.298% | 2,617 | 9.04% |
| 5 | 3,447 | 11.817% | 5,370 | 18.40% |
| 6 | 0 | 0.000% | 16,045 | 53.81% |

TOTAL ADDED: 31,703     TOTAL REMOVED: 31,703

197 Neb. 677, 250 N.W.2d 635 (1977). *But see Mayor of Tuscon v. Royal,* 20 Ariz.App. 83, 510 P.2d 394 (App.1973).

Although a substantial number of Anchorage voters were transferred into new districts, the resultant temporary disenfranchisement is, at worse, no greater than that generally imposed on residents who move into an Assembly district or who become of voting age shortly after an election has taken place.[12] The inequities existing during the transitional period of this reapportionment are not so substantial or so severe that truncation is constitutionally mandatory. Furthermore, the continuity and stability associated with a staggered schedule of elections, which would be lost if the terms of all Assembly members had been truncated, supports the Assembly's decision to reject truncation. We therefore cannot say that the Assembly's decision not to truncate

the terms of all Assembly members as part of the reapportionment plan was improper.

Kentopp argues that truncation is nonetheless the appropriate remedy in this case in view of the Assembly's improper failure to declare itself malapportioned in December 1979. We disagree. Neither the Charter nor related statutory provisions specify any remedy for the failure to issue a declaration of malapportionment when presented with a petition supported by evidence of malapportionment. In recognition of the respect due a coordinate branch of government, we conclude that the intrusive remedy of court ordered truncation is only warranted when supported by compelling considerations. We find no such compelling considerations in this case. Kentopp's assertion that the Assembly acted in bad faith in refusing to declare itself malapportioned is simply untenable.[13] It is apparent from

**12.** Anchorage submits that no voters will suffer any delay in their right to vote for an Assembly representative as a result of being transferred to a different district. We use "disenfranchisement" only to reflect that transferred voters will be represented by an Assembly member for whom they had no opportunity to vote.

**13.** Kentopp alleges that the Assembly's failure to provide separate public notice of its consideration of the truncation issue, purportedly in violation of the Anchorage Municipal Code, evinces the Assembly's bad faith. AO 81–76, an ordinance that proposed a Reapportionment Map, was introduced on May 12, 1981. Public notice was provided that the ordinance would be considered at the May 26 Assembly meeting. At the May 26 meeting, an oral amendment to AO 81–76 was introduced that would have truncated the terms of all Assembly members by scheduling an election for their seats in October 1981. The Assembly defeated the amendment and then enacted AO 81–76. The truncation amendment was again rejected upon reconsideration of AO 81–76 at the June 2, 1981, Assembly meeting.

The consideration and rejection of the truncation amendment at the May 26 meeting was proper. Anchorage Municipal Code § 2.30.050 provides in pertinent part:

*2.30.050 Introduction and action on ordinances.*

A. An ordinance may be introduced by an assemblyman at a regular meeting of the Assembly. Ordinances may be introduced at a special meeting of the Assembly provided such introduction has been included in the call of the meeting. The mayor may cause an ordinance to be introduced; such ordi-

nance shall state "By the Chairman of the Assembly at the Request of the Mayor." Following introduction of an ordinance by an individual assemblyman and upon setting of the public hearing date by three assemblymen, the clerk shall publish a notice containing the text of the ordinance or an informative summary of its contents, the time and place for a public hearing on the ordinance, and the time and place where copies of the ordinance are available. The public hearing shall be held at least seven days after publication of the notice.

B. Any three Assembly members may propose amendments to an ordinance at the time of introduction, the substance of which amendments shall be published with the notice of public hearing on the ordinance.

C. Amendments to proposed ordinances shall be submitted in writing where practicable.

Although written amendments are preferred, it is implicit in the foregoing that oral amendments may be offered at the time an ordinance is being considered. Where an oral amendment is offered from the "floor," there is no charter provision requiring separate public notice. We agree with Anchorage that such a rule would unduly hinder the functioning of the Assembly and, at least where the issues are so substantially intertwined as are truncation and reapportionment, such a rule would have little corresponding public utility.

The parties do not specifically address whether the reconsideration of AO 81–76 required separate notice of the truncation matter. We need not address this question. Even if such notice was deficient, it would have little if

the record that the Assembly was guided by an erroneous construction of Charter section 4.01, not by a desire to obfuscate and impede the reapportionment process. Kentopp observes that as a result of the Assembly's failure to issue a declaration of malapportionment in December 1979, the election of the six Assembly members in 1980 was tainted by the continuing malapportionment. Kentopp's observation is valid, but it does not mandate truncation as the appropriate remedy. The focus in fashioning an appropriate remedy must be on the extent of the taint and the intent of the legislative body, not just on the existence of the continuing malapportionment itself. Consideration of these factors in this case leads to the conclusion that it would be inappropriate for this court to intrude upon the prerogatives of the Anchorage Assembly by ordering truncation.[14]

## IV. THE CURRENT APPORTIONMENT PLAN

The superior court concluded that "the 'new' apportionment plan as set forth in Anchorage Ordinances Nos. 81–37 and 81–76 corrects the malapportionment that existed under the 'old' apportionment plan." As we discussed previously, deviations in the populations of electoral districts of up

to ten percent are presumptively valid, but variations in excess of ten percent are unlawful unless the government body justifies the malapportionment. *Groh v. Egan,* 526 P.2d at 877. *See White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). Kentopp argues on appeal that the reapportionment plan perpetrates malapportionment in violation of Charter section 4.01 and the equal protection clauses of the United States and Alaska Constitutions.[15]

The validity of the new plan, however, was not raised by the parties below. We conclude that the superior court erred in considering *sua sponte* the question of malapportionment under the reapportionment plan. Application of this settled rule is particularly appropriate in the present case because Anchorage must be afforded an opportunity to offer a justification for the comparative variances in excess of ten percent.

AFFIRMED in part, REVERSED and VACATED in part.

---

any bearing on our determination of whether the Assembly acted in bad faith.

**14.** We note that the recall and initiative provisions of the Anchorage Municipal Code may

serve some of the same purposes as court ordered truncation. AMC §§ 2.50.010(B), 2.50.-040(A) and 2.50.100.

**15.** Variances under the reapportionment plan are set forth below:

| District | Number of Members | Total Population | Population Per Assembly Member | % Variance From Mean Population Per Assembly Member of 14,444 |
|---|---|---|---|---|
| 1 | 2 | 28,856 | 14,428 | 0.1% |
| 2 | 1 | 13,279 | 13,279 | 8.1% |
| 3 | 2 | 30,001 | 15,001 | –3.8%* |
| 4 | 2 | 28,930 | 14,465 | –0.1% |
| 5 | 2 | 29,171 | 14,586 | –1.0% |
| 6 | 2 | 29,814 | 14,907 | –3.2% |

* (–) refers to underrepresented

---

As the table illustrates, three of the six districts have comparative variances in excess of ten percent. Thus, for example, the maximum comparative variance is 11.9% as because as the second district is 8.1% overrepresented and the third district is 3.8% underrepresented.